RMT:SK/ML/PB
F.#2015R01313

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                       15-CR-517 (S-1) (WFK)

ALI SALEH,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X


<u>THE GOVERNMENT'S PRE-TRIAL MOTIONS</u>



                                    RICHARD P. DONOGHUE
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


Saritha Komatireddy
Margaret Lee
Peter W. Baldwin
Assistant U.S. Attorneys
      (Of Counsel)

## PRELIMINARY STATEMENT

The defendant Ali Saleh has been charged with three counts of attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1) — specifically, for attempting to provide himself and others to the Islamic State of Iraq and the Levant ("ISIL", also known as "ISIS").  Jury selection is scheduled to commence on March 12, 2018, with trial to commence on April 3, 2018.

The government respectfully moves in limine to: (i) admit certain evidence related to the defendant's intention to create an improvised explosive device; and (ii) preclude the defense from introducing evidence or argument at trial regarding the defendant's mental health.

BACKGROUND

The government expects to establish the following facts at trial through witness and expert testimony, computer media, and physical and documentary evidence.

The defendant is a U.S. citizen who was born and raised in the Jamaica neighborhood of Queens, New York City.  For a brief period in 2015, he moved to Fort Wayne, Indiana, but he otherwise lived in Queens for the duration of his life.

In approximately 2013, the defendant became interested in the conflict in Syria, and he specifically became interested in ISIS, a foreign terrorist organization.  He thereafter swore an oath of allegiance to ISIS and decided to travel to the Middle East in support of ISIS.  On August 25, 2014, the defendant stated online, "I'm ready to die for the Caliphate, prison is nothing."  A few days later, on August 28, 2014, the defendant stated online, "Lets be clear the Muslims in the khilafah [caliphate] need help, the one who is capable to go over and help the Muslims must go and help."  That same day, the defendant made a reservation to travel from New York to Turkey, a country bordering Syria.  The defendant was ultimately prevented from traveling because his parents took his passport away.

The defendant then redirected his efforts to facilitating others' support of ISIS.  In October 2014, the defendant communicated with an ISIS supporter in Mali ("CC-1") through an online messaging platform.  CC-1 asked the defendant for advice on how to travel to Syria to join ISIS.  In response, the defendant provided CC-1 with the contact information of a known ISIS facilitator ("CC-2").  CC-1 then asked the defendant for funding to travel to Syria to join ISIS.  In response, the defendant sent CC-1 a wire transfer in the amount of $500 to fund CC-1's travel.  Around the same time period, the defendant communicated with

several other individuals in an effort to facilitate their support of ISIS, including known ISIS supporters in the U.K. ("CC-3") and Australia ("CC-4").

By the summer of 2015, the defendant rededicated his energies to joining ISIS, and embraced ISIS's directive to either travel to the Middle East to support the establishment of an Islamic State or take action at home to do so.  The defendant made preparations to do both.  In July 2015, the defendant bought fireworks containing explosive powder, hid them in his car and drove towards New York City.  The car broke down, and the defendant ultimately abandoned it and made his way to New York through other means of transportation.  On July 24, 2015, the defendant contacted an ISIS facilitator in Libya ("CC-5"), who had instructed followers to contact him "for hijrah [travel] advice to IS in Libya ONLY."  That same day, the defendant made a reservation to travel from New York to Egypt, a country bordering Libya, and went to JFK International Airport.  The defendant was ultimately denied boarding.  The defendant subsequently visited three additional international airports in Newark, Philadelphia and Indianapolis, but continued to encounter travel restrictions.  The defendant attempted to circumvent the apparent restrictions on his air travel by planning to take a train from Cleveland to Canada, where he intended to fly out to the Middle East.  After law enforcement intervention, however, the defendant did not board the train and instead returned to New York.

After his encounters with law enforcement, the defendant changed his online social media moniker and expressed his support for ISIS under new usernames.  On August 24, 2015, the defendant stated online, "I am a terrorist."  On September 1, 2015, the defendant stated online, "If they aren't implementing shariah [Islamic law] grab ur gun and implement shariah and see how fast the world turns against u."  That same day, the defendant

4

also stated online, "Akhi [brother] if implementing sharia [Islamic law] is easy do it in ur

neighborhood and defend it from kuffar [the infidels] and give bayah [an oath of allegiance]

to IS."

ARGUMENT

I.    The Court Should Admit Evidence Regarding
      the Defendant's Intention to Build an Explosive Device

   The government seeks to admit evidence at trial that the defendant intended to

build an improvised explosive device ("IED").  As discussed above, the defendant is charged

with three counts of attempting to provide material support to ISIS.  Between August 2014

and August 2015, the defendant made repeated attempts to travel to the Middle East to join

ISIS and also provided money to a co-conspirator in Mali, so that the individual could also

travel to join ISIS.  The evidence at trial will further show that throughout the entire period

of the charged conduct, the defendant was actively posting and reposting messages on

Twitter regarding his support for ISIS and the religious obligation to support and fight on

behalf of ISIS.  Furthermore, at trial, the government will present evidence that ISIS

instructed its followers that individuals should travel to join ISIS and fight but, if they could

not travel, they should commit an attack in their own countries in the name of ISIS.

   The evidence at trial will establish that the defendant was dedicated to this

message.  As set forth above, in July 2015, prior to renewing his attempts to travel to the

Middle East to join ISIS, the defendant bought fireworks containing explosive powder, hid

them in his car, and drove toward New York City.  The car broke down, and the defendant

ultimately abandoned it and continued on to New York.  Law enforcement subsequently

searched the vehicle and found approximately twenty-four fireworks hidden in a

compartment in the trunk.  The fireworks contained approximately 1,196 grams of low

explosive powder, consisting of both pyrotechnic material and black powder.  Approximately

one week later, on July 24, 2015, the defendant made a reservation to travel from New York

to Egypt, a country bordering Libya, and went to JFK International Airport.

   Law enforcement agents searched the defendant's apartment in Fort Wayne,

Indiana, where he had been living prior to leaving Indiana in July 2015.  During the search,

agents seized a cellphone belonging to the defendant.  On the cellphone, the defendant had

an electronic pamphlet entitled, "Muslim Gangs: The Future of Muslims in the West (Ebook

1:  How to Survive in the West)" (Exhibit A) (submitted under seal).[1]  The pamphlet

provides detailed instructions on how to create a bomb.  (Ex. A at 20.)  Specifically, the

pamphlet states that four main items are required:  "(i) a tightly closed Container (like a

metal box), (ii) filled with Explosives (example: the Blackpowder from Fireworks.) (iii) a

Fuse (from fireworks, or a Rubber [Latex]) string coming out of the Container. (iv) Shrapnel:

- a few metal nails, sharp rocks, ballbearing etc. which are added in the container and will

shoot out like bullets when the container explodes.)"  (Ex. A at 20.)  The pamphlet then

provides instructions on how to create specific devices, including a hand thrown IED.  (Id.)

The example provided is a soda can grenade, and the instructions specifically state that the

soda can should be filled with "[e]xplosive powder (i.e. from Fireworks)."  (Id.)  The

pamphlet then provides instructions on how to make more complicated explosive devices,

such as a pressure cooker and a pipe bomb.  (Ex. A at 20–23.)  In addition, on June 13, 2015,

the defendant retweeted an image of a soda can hand grenade with instructions on how to

---

[1] At trial, the government will seek to introduce a redacted version of the
pamphlet.  The proposed redaction is set forth in the attached exhibit on page 20.

build the IED.  The image and the instructions appear identical to those in the Muslim Gang pamphlet found on the defendant's phone.

At trial, the government anticipates calling FBI Special Agent Bomb Technician ("SABT") P.J. O'Brien to testify regarding the explosive powder contained in the seized fireworks and how that powder can be used in explosive devices – specifically, in creating the explosive devices described in the Muslim Gangs pamphlet.  The government anticipates that SABT O'Brien will testify that the fireworks seized from the defendant's car could be used to create multiple soda can grenades similar to the one depicted in the pamphlet and the tweet.  SABT O'Brien will testify that the explosive powder contained in the fireworks is precisely the type of pyrotechnic material that would be used to create the soda can grenade.  He would further testify that creating that soda can hand grenade is simple, and, since the defendant had fireworks with fuses, the only materials that he would still need to complete the device would be a can, masking tape and, perhaps, some rocks or nails to use as shrapnel.  The extent of the damage caused by the soda can grenade would depend on the amount and type of shrapnel included in the grenade.  SABT O'Brien will also testify that the explosive powder contained in the fireworks could be used to create the pressure cooker described in the pamphlet.  He will testify that the pressure cooker would require that the defendant obtain more materials and is more sophisticated than the soda can grenade to assemble.

A. Evidence of the Defendant's Intent to Create an Improvised
   Explosive Device Is Direct Evidence of the Charged Offenses

Evidence of uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b)(2) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted). In addition, the Second Circuit has explained that, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime." Id.; see also Fed. R. Evid. 401, 402. Indeed, the Supreme Court instructed trial courts to determine the admissibility of evidence "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

The above-described evidence arose out of the same transaction as the charged events and is inextricably intertwined with the charged crimes. As set forth above, in the summer of 2015, the defendant was determined to provide support to ISIS either by travelling to the Middle East or by taking action in the United States. As evidence of the defendant's dedication to ISIS, when the defendant left Indiana to go to New York, he was prepared for both options. He had fireworks in his car in case he could not successfully travel. The defendant not only possessed a pamphlet with instructions on how to create multiple types of explosive devices but he retweeted an image of the soda can grenade. As

SABT O'Brien will testify, the only other materials that the defendant needed in order to complete the soda can grenade were readily available – masking tape, a soda can and rocks. Although the defendant was forced to abandon the fireworks, when his car broke down on the way to New York, the fact that he was travelling with fireworks when he began his journey to provide himself to ISIS is direct evidence of the charged crime.  See United States v. Mavashev, 455 F. App'x 107, 111–12 (2d Cir. 2012) ("Evidence of prior bad acts is not considered 'other crimes' evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (quoting United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989))).

B.    Evidence of the Defendant's Intent to Create an Improvised
Explosive Device Is Also Admissible to Prove Intent, Plan and Knowledge

Even if the Court were to determine that this evidence constitutes "other acts" under Rule 404(b), it is still admissible to prove the defendant's intent, plan and knowledge, not his character, see Fed. R. Evid. 404(b)(2), and the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice.  The Second Circuit has long interpreted Rule 404(b) as an inclusive rule allowing the admission of relevant "other acts" evidence if that evidence is offered to prove something other than criminal propensity and if it passes the balancing test required by Federal Rule of Evidence 403.  See United States v. Moran-Toala, 726 F.3d 334, 345 (2d Cir. 2013); United States v. Carlton, 534 F.3d 97, 101 (2d Cir. 2008) (stating that "our Court follows the inclusionary approach to other crimes, wrongs or acts evidence" (internal quotation marks omitted)); United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998) (stating that other acts evidence "can be admitted for any

purpose except to show criminal propensity . . . unless the trial judge concludes that its

probative value is substantially outweighed by its potential for unfair prejudice" (internal

quotation marks omitted)); United States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996) ("This

court follows the inclusionary approach to other crimes, wrong, or acts evidence, under

which such evidence is admissible unless it is introduced for the sole purpose of showing the

defendant's bad character, or unless it is overly prejudicial under Fed. R. Evid. 403 or not

relevant under Fed. R. Evid. 402." (internal quotation marks and citations omitted)).

Here, as discussed in detail above, when the defendant left Indiana with

fireworks in his car, he had a plan to support ISIS either by travelling to the Middle East or

by taking action at home.  Thus, the evidence of the defendant's intent to build an IED at the

same time of the charged conduct is relevant to the defendant's knowledge, plan and intent.

See, e.g., United States v. McCallum, 584 F.3d 471, 475–76 (2d Cir. 2009) (stating that,

where defendant fails to indicate that "intent and knowledge would not be disputed," 404(b)

evidence showing defendant's intent and knowledge is "admissible during the government's

case in chief"); United States v. Tarricone, 996 F.2d 1414, 1421 (2d Cir. 1993) (finding that

evidence demonstrating defendant's intent or knowledge is admissible where issues of intent

or knowledge may be disputed by defendant at trial).

C.    The Probative Value of the Evidence Is Not
       Substantially Outweighed by the Risk of Unfair Prejudice

Moreover, the probative value of the evidence is not outweighed, much less

substantially outweighed, by the risk of unfair prejudice, as the evidence concerns conduct

similar to the conduct involved in the charged offenses.  The defendant is charged with three

counts of attempting to provide material support to ISIS.  The evidence of the intent to build

an IED is not more inflammatory than the conduct at issue, as it is simply further evidence of the same charged conduct.  See United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (stating that evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice when the evidence does not "involve conduct more inflammatory than the charged crime[s]").  Similarly, there is no risk of confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  To the contrary, the presentation of evidence regarding the defendant's intent to create an IED serves to clarify the issues at trial because it illustrates the defendant's plan and intent.  Nor will the presentation of the evidence cause undue delay as the testimony of the government's witnesses regarding the defendant's intent to create an IED will be limited to the evidence described above.  Therefore, the admission of evidence of the uncharged acts comports with the requirements of Rule 403 and should be permitted.

Because the government will introduce the above-described evidence for this non-propensity purpose, it is admissible under Rule 404(b).  The evidence is relevant because it demonstrates the defendant's intent to support ISIS either by travelling to the Middle East or by taking action in the United States.  The evidence therefore tends to prove that the defendant knowingly committed the charged offenses.  Moreover, the probative value of the evidence far outweighs any minimal risk of prejudice, particularly given the scope of the charged conduct.  Accordingly, the above-described evidence is admissible under Federal Rule of Evidence 404(b).

II.    The Court Should Preclude Evidence Related to Mental Disease or Defect

On March 1, 2016, defense counsel filed a motion requesting that the Court direct the Bureau of Prisons ("BOP") to transfer the defendant to a federal medical center for

11

"comprehensive psychiatric evaluation and treatment." (ECF No. 39.) On March 9, 2016, the government filed a response, noting that, although there was no basis in the record to question the defendant's competence, the government did not object to defense counsel's request that the defendant undergo a mental health evaluation. (ECF No. 41.) The Court subsequently ordered that the defendant be transferred to a BOP facility that performs psychiatric or psychological evaluations and that the BOP conduct a psychiatric or psychological evaluation consistent with 18 U.S.C. § 4241. (ECF No. 43.)

On May 5, 2016, BOP forensic psychologist Dr. Samantha E. DiMisa issued a report regarding her mental health evaluation of the defendant. (Exhibit B) (submitted under seal). Dr. DiMisa observed that the defendant "did not exhibit [] any acute psychological symptoms," that "his thoughts were organized and coherent, with no evidence of perceptual disturbance, delusional ideation, or a formal thought disorder," and that he "was not currently experiencing any delusions, hallucinations, or other serious psychopathology." (Ex. B at 14, 15.) Dr. DiMisa concluded that the defendant currently "does not present with a Mental Disease or Defect" and is "Competent to Stand Trial." (Ex. B at 19.)

Meanwhile, defense counsel retained defense psychiatrist Dr. Stephen N. Xenakis for additional mental health evaluation of the defendant. On September 30, 2017, Dr. Xenakis issued a report regarding his mental health evaluation of the defendant. (Exhibit C) (submitted under seal). Dr. Xenakis observed that the defendant "does not manifest signs of a floridly psychotic disorder with obvious hallucinations and delusions, but his thinking is unusual, idiosyncratic, and nonsensical." (Ex. C at 3.) Dr. Xenakis diagnosed the defendant with a personality disorder characterized as "schizotypal" and concluded that the defendant "appears to be competent to stand trial." (Ex. C at 2, 3.)

12

After this Court denied defense counsel's motion to have her client transferred for additional psychological testing, in part because defense counsel had provided an insufficient basis for such a transfer, defense counsel provided the government with a revised report from Dr. Xenakis, dated December 6, 2017. (Exhibit D) (submitted under seal). In his revised report, Dr. Xenakis claimed that the defendant's mental state had recently deteriorated and Dr. Xenakis escalated his diagnosis of the defendant from a personality disorder to "Other Specific Schizophrenia Spectrum and Psychotic Disorder" and "Major Depressive Disorder." (Ex. D at 1.)[2]

None of the foregoing reports conclude that the defendant was suffering from any mental disease or defect at the time that he committed the charged conduct.

A.    Applicable Law

a.    The Law Requires Prior Notice of Any Mental Health Defense

Federal Rule of Criminal Procedure 12.2(a) requires a defendant to provide written notice to the government (copying the Clerk of the Court) if the defendant intends to assert an insanity defense. Federal Rule of Criminal Procedure 12.2(b) requires a defendant to provide written notice to the government (copying the Clerk of the Court) if the defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant. Pursuant to Rule 12.2 and this Court's Pretrial Scheduling Order issued on July 18, 2017, the defendant must provide these notices within

---

[2] The Court has since ordered an updated evaluation and report from Dr. DiMisa regarding the defendant's present mental state. (ECF No. 92.) That report is pending.

the time provided for filing a pretrial motion or sufficiently in advance of the return date for such motions.

        b.  <u>The Law Places Limitations on Mental Health Testimony</u>

        Absent a properly presented insanity defense, evidence regarding the defendant's mental condition is not permitted as a defense in this case.

        In 1984, Congress enacted the Insanity Defense Reform Act ("IDRA"), which sets forth the parameters of an appropriate mental health defense in a federal criminal case:

> It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. <u>Mental disease or defect does not otherwise constitute a defense.</u>

18 U.S.C. § 17(a) (emphasis added).  In enacting this legislation, Congress sought to eliminate defenses based on "diminished capacity" and lack of volitional control, and reduce the dangers posed by expert psychological testimony regarding inherently malleable concepts, which could be used to mislead and confuse juries in criminal cases.  <u>See, e.g.</u>, <u>United States v. Cameron</u>, 907 F.2d 1051, 1061-62 (11th Cir. 1990) (summarizing objectives of the IDRA); <u>United States v. Pohlot</u>, 827 F.2d 889, 898-99 (3d Cir. 1987).

        In light of the IDRA, a defendant who has not raised an insanity defense may present expert testimony regarding a defendant's mental condition only in rare and narrowly defined circumstances -- namely, to negate the <u>mens rea</u> for specific intent crimes.  <u>See</u> <u>Cameron</u>, 907 F.2d at 1066; <u>Pohlot</u>, 827 F.2d at 900; <u>United States v. Agnello</u>, 158 F. Supp. 2d 285, 287 (E.D.N.Y. 2001); <u>United States v. Mezvinsky</u>, 206 F. Supp. 2d, 661, 664 (E.D. Pa. 2002); <u>see also</u> <u>United States v. Wescott</u>, 83 F.3d 1354, 1358 (11th Cir. 1996).  Lack of

mens rea is not a defense to general intent crimes.  See United States v. Johnson, 14 F.3d 766, 769-70 (2d Cir. 1994); United States v. Busic, 592 F.2d 13, 21 (2d Cir. 1978); United States v. Reed, 991 F. 2d. 399,400 (7th Cir. 1993) (collecting cases); United States v. Gonyea, 140 F.3d 649, 650 (6th Cir. 1998).

Furthermore, even with regard to specific intent crimes, the expert testimony must pertain to a legally acceptable theory of a lack of mens rea.  Pohlot, 827 F.2d at 905-06; Agnello, 158 F. Supp. 2d at 287.  Evidence that merely serves as an explanation, justification or excuse for the defendant's conduct does not pertain to a legally acceptable theory of the lack of mens rea.  United States v. Pendergraft, 120 F. Supp. 2d 1339, 1344 (M.D. Fla. 2000); United States v. Baxt, 74 F. Supp. 2d 436, 440-41 (D.N.J. 1991).  As the Eleventh Circuit has noted, when a defendant claims to have psychiatric evidence that he lacked the requisite intent:

> [M]ost often that defendant is speaking of an incapacity to reflect or control the behaviors that produced the criminal conduct.  Such evidence is not psychiatric evidence to negate specific intent and should not be admitted.  Otherwise, the insanity defense will be improperly resurrected in the guise of showing some other affirmative defense, such as that the defendant had a diminished responsibility or some similarly asserted state of mind which would serve to excuse the offense and open the door, once again, to needlessly confusing psychiatric testimony.

Cameron, 907 F.2d at 1066 (footnotes and internal quotation marks omitted).

Mens rea is generally satisfied "by any showing of purposeful activity, regardless of its psychological origins."  Pohlot, 827 F.2d at 904.  Indeed:

> Only in the rare case . . . will even a legally insane defendant actually lack the requisite mens rea purely because of mental defect. . . . [A] man who commits murder because he feels

15

> compelled by demons still possesses the <u>mens</u> <u>rea</u> required for murder.

<u>Id.</u> at 900 (citation omitted).

Even when offered to negate <u>mens</u> <u>rea</u>, courts have imposed strict requirements that the defendant clearly demonstrate, in advance of trial, that there is a direct link between the expert testimony and the specific intent that the government must prove. <u>See</u> <u>Cameron</u>, 907 F.2d at 1067; <u>see</u> <u>also</u> <u>United States v. Boykoff</u>, 186 F. Supp. 2d 347, 349 (S.D.N.Y. 2002) (courts have "refused to admit mental disease evidence where no direct link could be established"); <u>United States v. Pirro</u>, 76 F. Supp. 2d 478, 485 (S.D.N.Y. 1999) (same).

It is not enough for a defendant to show that his mental condition impaired his judgment during the relevant time period.  <u>See, e.g.</u>, <u>United States v. Baxt</u>, 74 F. Supp. 2d 436, 440-41 (D.N.J. 1999) (evidence of "impaired judgment" does not negate <u>mens</u> <u>rea</u>); <u>Richards</u>, 9 F. Supp. 2d at 459 (same); <u>Mezvinsky</u>, 206 F. Supp. 2d at 672–73 (evidence of "poor judgment" and "bad choices" does not negate <u>mens</u> <u>rea</u>).  It is not enough for a defendant to show that his mental condition provided a motivation for him to commit the charged crimes.  <u>See, e.g.</u>, <u>Pendergraft</u>, 120 F. Supp. 2d at 1344 (evidence that merely explains or justifies the conduct does not negate <u>mens</u> <u>rea</u>).  It is also not enough for a defendant to show that his mental condition contributed to an inability to control his actions during the relevant time period.  <u>See</u> <u>Cameron</u>, 907 F.2d at 1066 (evidence of "an incapacity to reflect or control" behavior does not negate <u>mens</u> <u>rea</u>); <u>Agnello</u>, 158 F. Supp. 2d at 287-88 (evidence that the defendant is "unable to control" actions does not negate <u>mens</u> <u>rea</u>).

Moreover, even where evidence of a defendant's mental condition has some relevance to the issue of <u>mens rea</u>, it may be excluded under Federal Rule of Evidence 403. Courts have often recognized that the use of mental condition evidence to negate <u>mens rea</u> "tends to reintroduce the very concepts that Congress wanted to exclude [in enacting the IDRA] and thereby to mislead the jury." <u>United States v. Schneider</u>, 111 F.3d 197, 203 (1st Cir. 1997). Such evidence "presents an inherent danger that it will distract the jury from focusing on the actual presence or absence of <u>mens rea</u>." <u>Cameron</u>, 907 F.2d at 1067. As Judge Becker cautioned in <u>Pohlot</u>:

> Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of <u>mens rea</u>. Presenting defense theories or psychiatric testimony to juries that do not truly negate <u>mens rea</u> may cause confusion about what the law requires.

<u>Pohlot</u>, 827 F. 2d at 890. For these reasons, such evidence, even if relevant and helpful under Rules 401 and 702, is properly excluded under Rule 403 where its capacity to mislead and confuse the jury substantially outweighs whatever limited probative value it may have. <u>See, e.g.</u>, <u>Agnello</u>, 158 F. Supp. 2d at 289-90 (proffered testimony regarding defendant's bipolar disorder could mislead the jury into thinking such evidence excused the offense); <u>Griffin</u>, 1996 WL 140073, at *10 ("expert psychiatric testimony regarding inherently malleable psychological testimony can be misused at trial to mislead or confuse the jury") (internal quotations omitted); <u>United States v. Vinieris</u>, 611 F. Supp. 1046, 1049 (S.D.N.Y. 1985) (excluding proffered psychiatric testimony under Rules 403 and 702 "upon the ground that it would not assist the trier of fact to understand the evidence or to determine a fact in issue and that, even if relevant, its probative value [was] substantially outweighed by the danger of confusion of the issues or of misleading the jury").

Courts must be "extremely cautious" in permitting expert testimony on a defendant's mental condition, <u>United States v. Richards</u>, 9 F. Supp. 2d 455, 457 (D.N.J. 1998), and avoid resurrecting precisely the kinds of defenses that the IDRA was enacted to prohibit, <u>Cameron</u>, 907 F.2d at 1066; <u>Agnello</u>, 158 F. Supp. 2d at 287; <u>Richards</u>, 9 F. Supp. 2d at 457.  As the Eleventh Circuit explained in <u>Cameron</u>:

> Because psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury from focusing on the actual presence or absence of <u>mens rea</u>, and (3) may easily slide into wider usage that opens up the jury to theories of defense more akin to justification, district courts must examine such psychiatric evidence carefully to ascertain whether it would, if believed, support a legally acceptable theory of lack of <u>mens rea</u>.

<u>Cameron</u>, 907 F.2d at 1067 (internal quotation marks omitted); <u>see also</u> <u>United States v. Schneider</u>, 111 F.3d 197, 203 (1st Cir. 1997) (psychiatric evidence offered to negate intent "tends to reintroduce the very concepts that Congress wanted to exclude and thereby to mislead the jury"); <u>United States v. Boykoff</u>, 186 F. Supp. 2d 347, 350 (S.D.N.Y. 2002) (same).

  B.    <u>Discussion</u>

  a.    <u>The Defendant Has Not Provided Notice of Mental Health Evidence</u>

The defendant has failed to give notice under either Rule 12.2(a) or 12.2(b). The defendant's failure to give notice under Rule 12.2(b) should preclude him from offering any expert evidence on the issue of the defendant's mental disease, mental defect, or any other mental condition.  Fed. R. Crim. P. 12.2(d)(1).

      b.  <u>The Defendant is Not Permitted to Present</u>
          <u>Mental Health Evidence Against These Charges</u>

Even if the defendant had provided timely notice, evidence relating to the

defendant's mental disease, mental defect, or any other mental condition would be

impermissible.

The defendant has not suggested that he was insane at the time of the charged

conduct, and the limited circumstances in which non-insanity mental health evidence is

permitted -- to negate the <u>mens</u> <u>rea</u> for specific intent crimes -- are not present here because

the defendant is charged only with general intent crimes.  <u>See</u> <u>Holder v. Humanitarian Law</u>

<u>Project</u>, 561 U.S. 1, 16-17 (2010) (explaining that attempting to provide material support to a

foreign terrorist organization is a general intent crime); <u>United States v. Farhane</u>, 634 F.3d

127, 135 (2d Cir. 2011) (same); <u>United States v. Taleb-Jedi</u>, 566 F. Supp. 2d 157, 174-75

(E.D.N.Y. 2008) (Cogan, J.) (same).  There is therefore no basis for any permissible mental

health defense.  <u>See</u> 18 U.S.C. § 17(a) (short of insanity, "[m]ental disease or defect does not

otherwise constitute a defense"); <u>United States v. Johnson</u>, 14 F.3d 766, 769-70 (2d Cir.

1994) (lack of <u>mens</u> <u>rea</u> is not a defense to general intent crimes).

      c.  <u>Permitting the Defendant to Present Mental Health</u>
          <u>Evidence Would Be Legally Irrelevant and Confuse the Jury</u>

Moreover, evidence relating to the defendant's mental disease, mental defect,

or any other mental condition would be legally irrelevant and serve only to confuse the jury.

<u>See</u> Fed. R. Evid. 402, 403.

The defendant's evaluators have variously suggested that he exhibits poor

judgment and impulse control.  However, as explained above, it is not enough under the law

for expert testimony to suggest that the defendant suffers from impaired judgment.  <u>See, e.g.,</u>

United States v. Baxt, 74 F. Supp. 2d 436, 440-41 (D.N.J. 1999) (evidence of "impaired judgment" does not negate mens rea); Richards, 9 F. Supp. 2d at 459 (same); Mezvinsky, 206 F. Supp. 2d at 672-73 (evidence of "poor judgment" and "bad choices" does not negate mens rea). A defendant may knowingly and intentionally attempt to commit a specific act even while suffering from impaired judgment.

In addition, it is well-settled that the IDRA rendered lack of volitional capacity -- that is, a defendant's inability to control his actions -- unavailable as a defense. See United States v. Griffin, No. 94-CR-631, 1996 WL 140073, at *9 (S.D.N.Y. Mar. 27, 1996); United States v. Cox, 826 F.2d 1518, 1526 (6th Cir. 1987); Pohlot, 827 F.2d at 896.; United States v. Agnello, 158 F. Supp. 2d 285, 288 (E.D.N.Y. 2001) (denying admissibility of psychiatric evidence because "the evidence is aimed, not at negating intent, but rather at suggesting that the defendant was unable to control his actions, an issue which Congress has expressly excluded as a defense"); Schipke v. United States, No. 10-CV-001, 2011 WL 10550694, at *10 (D. Ariz. Oct. 21, 2011) ("the IDRA allows evidence that shows that a defendant 'did not do it,' . . . not that 'he could not help it'"). Congress eliminated lack of volitional control as a defense because it was the subject of "particularly strong criticism," including the observation that "[n]o test is available to distinguish between those who cannot and those who will not conform to legal requirements. The result is an invitation to semantic jousting, metaphysical speculation and intuitive moral judgments masked as factual determinations." S. Rep. No. 98-225, at 3408-09. Thus, conclusions regarding impulse control are impermissible psychiatric evidence. See United States v. Dupre, 339 F. Supp. 2d 534, 541 (S.D.N.Y. 2004) (citing cases); see, e.g., Cameron, 907 F.2d at 1066 (defense based on "compulsion or inability or failure to engage in normal reflection" precluded); Eff, 524 F.3d

at 719 (defense based on "impulse control" and "a person's ability to inhibit behavior" precluded); United States v. Willis, 187 F.3d 639, at *5 (6th Cir. 1999) (expert testimony that defendant "felt compelled" to protect himself and "had no choice but to carry a gun as a way to protect himself" precluded); United States v. Agnello, 158 F. Supp. 2d 285, 288 (E.D.N.Y. 2001) (expert testimony suggesting that defendant was "unable to control his actions" precluded); United States v. Robinson, 804 F. Supp. 830, 833-34 (W.D. Va. 1992) (expert testimony that mental condition "caused [defendant] to act in a compulsive manner" precluded); Griffin, 1996 WL 140073, at *10-11 (expert testimony that defendant can become "easily controlled" and "readily influenced" precluded); United States v. Steward, No. 05-CR-36, 2008 WL 4737436, at *1 (W.D. Ky. Oct. 27, 2008) (expert testimony that "defendant's capacity to conform his conduct to the requirements of the law was compromised by mental disease or defect" precluded).  Such opinion testimony is thus irrelevant and impermissible and should be precluded.  See United States v. Solomon-Eaton, No. 12-CR-352, slip op. at 18-19 (E.D.N.Y. Apr. 9, 2014) (Matsumoto, J.) (precluding defense from presenting evidence of a volitional or diminished capacity defense at trial); Agnello, 158 F. Supp. 2d at 288 (Gershon, J.) (same).

Permitting such testimony regardless of its ability to meet the minimum standards required by law presents a danger of confusing the issues and misleading the jury that substantially outweighs its limited probative value.  Fed. R. Evid. 403.  It would tend to reintroduce the very concepts that Congress excluded in the IDRA, mislead the jury into thinking that those concepts can negate or excuse guilt, and distract the jury from focusing on the actual presence or absence of mens rea.  See Cameron, 907 F.2d at 1061-62 (in the IDRA, "Congress was concerned about the danger that expert psychiatric testimony

regarding inherently malleable psychological concepts can be misused at trial to mislead or confuse the jury"); Pohlot, 827 F.2d at 890 (noting how presenting defense theories or psychiatric testimony to juries where the evidence does not meet legal standards "may cause confusion about what the law requires"); Griffin, 1996 WL 140073, at *10 ("psychological testimony can be misused at trial to mislead or confuse the jury"); see also United States v. Dupre, 462 F.3d 131, 138 (2d Cir. 2006) (no abuse of discretion where district court excluded testimony of psychological expert under Rule 403 because of "its capacity to mislead and confuse the jury, and to permit the defendant to put an impermissible theory of justification before the jury").

Such evidence also presents a danger of unfair prejudice that substantially outweighs its limited probative value. Fed. R. Evid. 403. Typical testimony from mental health professionals includes a lengthy account of the defendant's childhood, challenges in growing up, and other personal history. This information has no relevance to the guilt phase of the case. Information about the defendant's personal history and prior experiences poses a danger of jury nullification -- that is, that the jury will decide its verdict not in accordance with the evidence and the law but on the basis of sympathy. See United States v. Copeland, 291 F. App'x 94, 97 (9th Cir. 2008) (affirming preclusion of psychologist testimony about defendant's childhood abuse, even where expert was permitted to testify about the defendant's mental condition, because "the details were not relevant" and the "additional probative value of knowing the specific trauma was minimal and did not substantially outweigh the possible prejudice to the government of jury nullification based on sympathy"). The Court has an affirmative "duty to forestall or prevent" this danger. United States v. Thomas, 116 F.3d 606, 614-16 (2d Cir. 1997) (jury nullification is a violation of a juror's

oath and courts may not permit jury nullification to occur "when it is within their authority to prevent").

In addition, such evidence is not the proper subject of expert testimony because the expert's specialized knowledge does not "assist the trier of fact." Fed. R. Evid. 702 (permitting expert testimony only if specialized knowledge will "assist the trier of fact"); United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991) ("If the testimony is instead directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help, the testimony is properly excludable." (internal quotation marks and citation omitted)). Much of Dr. Xenakis's conclusions, for example, pertain to the defendant's motivations for committing the charged crimes: that the defendant "could not escape the images of children and families victimized by injuries and brutality in Syria" and that those images "compelled him to act and feel like he had to flee the United States." Ex. C at 3. Such "questions of intent and motivation are for the jury and not for expert witnesses." United States v. Busic, 592 F.2d 13, 22 (2d Cir. 1978) (noting that experts in law and psychiatry are not so much better than jurors in judging intent). Where, as here, the defendant can himself testify as to his motivations for his actions, an expert's testimony unnecessarily stamps the "imprimatur of a clinical label" on what is already within the jury's experience. DiDomenico, 985 F.2d 1159 (2d Cir. 1993); United States v. Ging-Hwang Tsoa, No. 13-CR-137, 2013 WL 6145664, at *10 (E.D.V.A. Nov. 20, 2013) (precluding expert testimony about the defendant's alleged inability to completely understand English because it "can be easily developed through other sources and is well within the purview of the average juror"); United States v. Esch, 832 F.2d 531, 535 (10th Cir. 1987) (precluding expert psychologist testimony about the defendant's "personality characteristics . . . because it

addressed a subject matter within the knowledge and experience of the jury").  The

"imprimatur of a clinical label" is "neither necessary nor helpful for the jury to make an

assessment of [the defendant's] state of mind."  DiDomenico, 985 F.2d at 1163 (precluding

expert testimony of the defendant's "asserted vulnerability and susceptibility to being

duped").  Admitting such testimony impermissibly encroaches on the province of the jury.

See United States v. Mejia, 545 F.3d 179, 194-96 (2d Cir. 2008) (district court erred in

admitting expert testimony on matters not beyond the ken of the average juror in violation of

Rule 702); United States v. Escobar, 462 F. App'x 58, 62 (2d Cir. 2012) (expert's testimony

violated Rule 702 by "testifying to facts well within the grasp of the average juror" (internal

quotation marks omitted)); United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)

(district court may err by admitting expert testimony where "the subject matter of the

expert's testimony is not beyond the ken of the average juror.").

        Finally, such evidence unacceptably employs an expert to serve as a conduit

for hearsay evidence to reach the jury.  Hearsay evidence is generally inadmissible because it

is presumptively unreliable.  See Fed. R. Evid. 802; United States v. Tellier, 83 F.3d 578,

580 (2d Cir. 1996).  Experts may disclose hearsay to the jury only if "its probative value

substantially outweighs its prejudicial effect."  Fed. R. Evid. 703; see also United States v.

Locascio, 6 F.3d 924, 938 (2d Cir. 1993).  The Second Circuit expressed particular concern

about the impropriety of admitting hearsay through an expert: an expert may not simply act

as a conduit for hearsay evidence to reach the jury.  See Mejia, 545 F.3d at 197; United

States v. Dukagjini, 326 F.3d 45, 54 (2d Cir. 2003).  The defendant's self-serving statements

regarding his personal history, motivations and state of mind -- where the expert adds

nothing by way of relevant opinion -- are of limited probative value and highly prejudicial.

To the extent that the defendant wants to convey to the jury what he felt at the time of the charged crimes, he must take the stand and testify, and subject himself to the courtroom's traditional safeguards of the oath, observation of demeanor, and cross-examination. Anything less denies the jury the opportunity to fairly assess the defendant's credibility and the government the opportunity to challenge the defendant through cross-examination. See Mejia, 545 F.3d at 197 (district court erred in admitting expert testimony that violated Rule 703 because it merely "repeat[ed] hearsay evidence without applying any expertise whatsoever, a practice that allows [the offering party] to circumvent the rules prohibiting hearsay"); United States v. Rubi-Gonzalez, 311 F. App'x 483, 487 (2d Cir. 2009) (summary order) (expert's testimony violated Rule 703 "by transmitting hearsay evidence directly to the jury"); Escobar, 462 F. App'x at 62 (same).

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the

Court grant the government's motions.

Dated: Brooklyn, New York
         February 9, 2018

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York

                         By:    _____/s/_____
                                        Saritha Komatireddy
                                        Margaret E. Lee
                                        Peter W. Baldwin
                                        Assistant United States Attorneys
                                        (718) 254-7000

cc:      Clerk of Court (WFK) (via ECF)
         All counsel of record (via ECF)