1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,     : 15-CR-517(WFK)
                            :
                            :
       -against-           : United States Courthouse
                            : Brooklyn, New York
                            :
                            : November 17, 2021
ALI SALEH,                 : 12:00 p.m.
                            :
        Defendant.        :
                            :

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:   BREON PEACE
                      Acting United States Attorney
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
               BY:  SARITHA KOMATIREDDY
                      ALEXANDER MINDLIN
                      DOUG PRAVDA
                      Assistant United States Attorneys

For the defendant:    BY:  ANTHONY RICCO, ESQ.
                     BY:  MICHAEL BACHRACH, ESQ.
                     BY:  STEVE ZISSOU, ESQ.

Court Reporter:  Michele D. Lucchese, RPR, CRR
                 Official Court Reporter
                 (718) 613-2272
                 E-mail: MLuccheseENDY@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by Computer-aided Transcription.

Proceedings                                          2

1          THE COURTROOM DEPUTY:  United States District Court

2     for the Eastern District is now open for the transaction of

3     all business which may come before it.  The Honorable William

4     F. Kuntz, II presiding.

5          Criminal cause for a sentencing 15-CR-517, USA

6     versus Ali Saleh.

7          Counsel, please state your appearances for the

8     record, starting with the Government.

9          MS. KOMATIREDDY:  Good morning, Your Honor.  Saritha

10    Komatirredy for the United States.  I'm joined by my

11    co-counsel AUSA Alexander Mindlin, also seated at the table is

12    counsel for the parallel matter, AUSA Doug Pravda.

13         Behind us are case agents, Special Agents Brent

14    Newman and William Slattery of the FBI.

15         THE COURT:  Good afternoon.  Sit down.

16         MR. RICCO:  Good morning, Your Honor.  Anthony

17    Ricco.  Last name R-I-C-C-O.  One of the three lawyers for Mr.

18    Ali Saleh.  Good afternoon.

19         MR. BACHRACH:  Good afternoon, Your Honor.  Michael

20    Bachrach also for Ali Saleh.

21         MR. ZISSOU:  Also appearing, Steve Zissou,

22    Z-I-S-S-O-U.  Good to see you again, Your Honor.

23         THE COURT:  Defendant is present.  Sit down.

24         The Court will now proceed in separate and

25    successive proceedings as required by Part 3D of the

Proceedings                                                                3

1   sentencing guidelines to prevent multiple punishments for

2   substantially identical conduct.

3            This Court will now sentence the defendant, Ali

4   Saleh, in Docket Number 15-CR-517.

5            The defendant pled guilty to attempting to provide

6   material support to a foreign terrorist organization in

7   violation of Title 18, U.S.C., Section 2339B(a)(1).

8            One sentence is pronounced in this case, this Court

9   will then adjourn this proceeding immediately to proceed to

10  sentencing the defendant in case docket 18-CR-468.

11           Counsel for the Government, are you ready to

12  proceed?

13           MS. KOMATIREDDY:  Yes, Your Honor.

14           THE COURT:  Defense counsel, are you ready to

15  proceed?

16           MR. RICCO:  Yes, sir.

17           THE COURT:  Probation, are you ready to proceed?

18           THE PROBATION OFFICER:  Yes, Your Honor.

19           THE COURT:  Mr. Saleh, you and your counsel have had

20  ample opportunity to review carefully and to discuss your

21  revised pre-sentence investigation report filed on December

22  17th of 2019, its first addendum filed on November 4 of 2021

23  and its second addendum filed on November 15 of 2021.

24           You and your counsel have also had an opportunity

25  review carefully and have, in fact, reviewed carefully the

Proceedings                                          4

1   following documents:  The Complaint filed on September 16,

2   2015, the superseding indictment filed on February 11, 2016,

3   the plea agreement dated July 24, 2018, defense counsel's

4   sentencing memorandum and attached exhibits filed on November

5   12 of 2021, the Government's sentencing memorandum filed on

6   October 22nd of 2021.

7         Are there any additional documents that either

8   counsel wishes to call to the Court's particular attention at

9   this time?  From the Government?

10         MS. KOMATIREDDY:  No, Your Honor.  Thank you.

11         THE COURT:  Probation?

12         THE PROBATION OFFICER:  No, Your Honor.

13         THE COURT:  Defense counsel?

14         MR. RICCO:  No, sir.

15         THE COURT:  Mr. Saleh, you have the right to address

16   this Court before I impose sentence.  I will give you the

17   opportunity to do so in a few minutes, and at that time, say

18   anything you think appropriate before I finalize my judgment

19   in this case.

20         If you are not satisfied with your counsel's

21   representations and/or if you believe you have not received

22   the effective assistance of counsel, you may raise a claim of

23   ineffective assistance of counsel at an appropriate time and

24   in an appropriate forum.

25         On July 24, 2018, the defendant pled guilty to

Proceedings                                              5

1    Counts Two and Three of the superseding indictment charging

2    the defendant with attempting to provide material support to a

3    foreign terrorist organization, specifically, the defendant

4    swore an oath of allegiance to ISIS, one of the preeminent

5    terrorist threats to the United States of America in the world

6    today, responsible for more deaths than any other terrorist or

7    extremist group over the past several years.  At the time of

8    the defendant's offense, ISIS was pursuing the objective of

9    establishing an Islamic State, or caliphate, based in the

10   Middle East.  At the time of the defendant's offense, ISIS

11   routinely carried out killings, murders, and deliberate

12   targeting of civilians, mass executions, persecutions of

13   individuals of communities on the basis of their religion,

14   nationality, or ethnicity, kidnaping of civilians; forced

15   displacement of Shia Muslim communities and minorities;

16   killing and maiming of children, rape, and other forms of

17   sexual violence.

18           Using social media, this defendant professed his

19   support for the terrorist organizations and assisted their

20   recruitment efforts.  Defendant made multiple attempts from

21   multiple cities to fly to Syria to join and to fight for ISIS.

22   American law enforcement prevented him from achieving his

23   goals.

24           This defendant has been in pretrial detention at the

25   Metropolitan Detention Center since September of 2015.  As

1  detailed in the pre-sentence investigation report and its

2  addenda, this defendant has been cited on at least 100

3  separate occasions for committing disciplinary infractions,

4  many of which involved acts of violence on his part.

5           Among other items, this defendant has repeatedly

6  been cited for refusing to obey orders; covering his cell

7  window unit; hitting the distress alarm button when no

8  emergency existed; refusing to attend disciplinary hearings,

9  refusing to stand for prison counts; being found in

10 unauthorized spaces during lockdowns; possessing dangerous

11 weapons, interfering with security devices; breaking

12 handcuffs, light fixtures, food slots, and other furniture in

13 his cell; fighting with other inmates; and violently

14 assaulting various Bureau of Prisons officials.

15          Most notably, this defendant violently assaulted a

16 federal officer at the MDC on July 13, 2018.  The defendant

17 attacked the officer with a knife.  The assault resulted in a

18 new prosecution, to which the defendant pled guilty, and for

19 which he will be separately sentenced in the proceeding

20 immediately following this one.

21          The United States Code sets the following sentencing

22 parameters for a violation of Count Two of the superseding

23 indictment, attempt to provide material support to a foreign

24 terrorist organization:  A statutory maximum imprisonment term

25 of 15 years, a statutory maximum supervised release term of

Proceedings                                              7

1    life, a fine of up to $250,000, and a mandatory special

2    assessment of $100.

3            The United States Code sets the following sentencing

4    parameters for a violation of Count Three of the superseding

5    indictment, attempt to provide material support to a foreign

6    terrorist organization:  A statutory maximum imprisonment term

7    of 20 years, a statutory maximum supervised release term of

8    life, a fine of up to $250,000 and a mandatory special

9    assessment of $100 per count.

10           The sentences imposed on these counts may run

11   consecutively.

12           This Court must also consider the sentencing

13   parameters set by the United States Sentencing Guidelines.

14   The applicable guidelines for violation of Title 18, United

15   States Code, Section 2339B(a)(1) is USSG Section 2M5.3(A),

16   which all parties agree provides a base offense level of 26.

17           The parties also agree that because the defendant

18   transported 1,196 grams of explosive powder in a concealed

19   compartment inside the trunk of his car during the instant

20   offense, two levels are added pursuant to USSG --

21           THE defendant:  That's not true.

22           THE COURT:  -- 2M5.3(b)(1)(C).

23           The parties also agree that because the offense is a

24   felony that involved or was intended to promote a federal

25   crime of terrorism, the offense level is increased by 12

Proceedings                                    8

1  levels.

2          Furthermore, the Government and defense counsel

3  agree that the defendant's timely acceptance of his

4  responsibility pursuant to USSG Sections 3E1.1(a) through (b)

5  results in a three-level reduction.  Probation does not credit

6  the defendant with this reduction because Probation groups the

7  offenses in dockets 15-CR-517 and 18-CR-468.  Therefore, the

8  defendant's total offense level according to the Government

9  and defense counsel is 37.  Defendant's total offense level

10 according to Probation is 40.

11         The parties agree the defendant has a Criminal

12 History Category of six.  Defendant has no known prior

13 criminal conviction and his criminal history score is zero,

14 which normally establishes a criminal history category of one.

15 However, because the instant offense is a felony that

16 involved, or was intended to promote, a federal crime of

17 terrorism, defendant's Criminal History Category is a category

18 six.

19         A total offense level of 37 or 40, with a Criminal

20 History Category of six, yields a guidelines imprisonment

21 range of 360 months to life.  However, because of the

22 statutory maximum sentence, the effective Guidelines range is

23 360 months to 420 months of imprisonment.

24         In addition, the guidelines further suggest a term

25 of supervised release of one year to life, a fine of between

Proceedings                                    9

1  50,000 and $500,000, and the defendant is ineligible for

2  Probation.

3          United States Probation Department recommends a

4  sentence of 15 years in custody on Count Two and 20 years of

5  custody on Count Three to run consecutively, 15 years of

6  supervised release to run consecutively on each count, and the

7  special conditions outlined in their sentencing

8  recommendation.

9          The Government recommends a guidelines sentence of

10 between 360 and 420 months and notes that the defendant also

11 consented to a life term of supervised release in the plea

12 agreement.

13         Defense counsel does not ask the Court for a

14 specific sentence in this case, but instead asks for a

15 sentence of not more than 300 months on both this indictment

16 and the indictment charged in Docket Number 18-CR-468, which

17 is also pending before this Court.

18         Counsel, am I missing anything pertinent to today's

19 proceeding from the Government?

20         MS. KOMATIREDDY:  Not from the Government, Your

21 Honor.

22         THE COURT:  Defense counsel?

23         MR. RICCO:  No, sir.

24         THE COURT:  Probation?

25         THE PROBATION OFFICER:  No, Your Honor.

```
                      Proceedings                    10
```

1          THE COURT:  Are there any other objections that

2    either counsel wishes to raise other than those that have been

3    submitted in writing to the Court?

4          From the Government?

5          MS. KOMATIREDDY:  No, Your Honor.

6          THE COURT:  Probation?

7          THE PROBATION OFFICER:  No, Your Honor.

8          THE COURT:  Defense counsel?

9          MR. RICCO:  No, sir.

10         THE COURT:  That being the case, I will now turn it

11   over to the defense.

12         MR. RICCO:  Good morning, Your Honor.

13         The first thing I'd like to do, Your Honor, is note

14   present in court today is the family of Ali Saleh.  I would

15   also like to note that his mother and father are present,

16   along with other relatives, and that they have been here on

17   virtually every appearance in connection with this case that

18   has gone on now more than six years.  It's more than one case,

19   but over the course of the cases.

20         As Your Honor is aware, I was not the initial

21   counsel in this case.  I think I came into this case maybe

22   about two years after Mr. Saleh was in custody and proceedings

23   had took place before Your Honor.

24         During the time period that I have represented Mr.

25   Saleh, we had many discussions about the case, about his life

Proceedings                                        11

1   before he was arrested on the original charges, and about some

2   plans that he had for a future for himself.  Those

3   conversations led us to a point where Mr. Saleh was prepared

4   and did take acceptance of responsibility for his conduct in

5   connection with this case.

6           Judge, long before I got involved in this case, Mr.

7   Saleh had been in the SHU for years.  Every visit that I have

8   had with Mr. Saleh has been in the SHU.  Every visit with Mr.

9   Saleh in the SHU has been cordial, pleasant, respectful and

10  without incident.

11          After Mr. Saleh -- just before Mr. Saleh entered a

12  plea in this case, of course we had the conduct that related

13  in the second indictment, the conduct was captured on

14  videotape, very serious conduct that Your Honor has alluded

15  to.  Notwithstanding that conduct, Mr. Saleh came into court

16  on the 24th of July and entered a plea, took acceptance of

17  responsibility for his conduct.

18          Over the years, Your Honor, I have had the

19  opportunity to appear in this courthouse and in courthouses

20  across our country with individuals who are charged with

21  serious crimes of this nature, including the bombing of the

22  World Trade Center, the conspiracy to blow up the World Trade

23  Center.

24          Under the Criminal Justice Act, I have represented

25  individuals on death row, individuals who have been involved

Proceedings                                          12

1    in serious and profound criminal conduct, and I have had the

2    opportunity to visit with inmates who have served for decades

3    in isolation on Range 13 at ADMAX and I have seen the effects

4    of long-term incarceration and isolation on human beings that

5    take place over decades of being isolated in penitentiaries.

6            My own observations are consistent with the findings

7    of the U.N. when the U.N. adopted what is known as the Nelson

8    Mandela rules which defines segregated conduct of more than 15

9    days is torture.

10           The State of New York, in 2011, passed into law an

11   act called the Human Alternatives to Long-Term Solitary

12   Confinement Act known as the HALT Solitary Confinement Act,

13   and under that act defendants are not allowed to be kept in

14   segregated housing for more than 15 consecutive days.

15           Those legislative findings by New York State, which

16   are far ahead of our Federal Government on this issue, and the

17   United Nations, which is far ahead of both New York State and

18   the Federal Government on this issue, findings are based on

19   studies done by the World Health Organization, scholars,

20   psychologists, who have interviewed thousands of men and women

21   who have served in solitary confinement.  And what the experts

22   and scholars have said mirrors my own experience as a

23   professional that individuals who are in these circumstances

24   for more than 15 days consecutive begin to hallucinate, they

25   begin to have anxiety attacks, they begin to suffer from panic

Proceedings                                                    13

1   attacks, they suffer from deep paranoia, which results in a

2   loss of control and impulsive conduct.

3            The defendant in this case has been in the Special

4   Housing Unit, by my estimation, more than 2,190 days.  The

5   concerns about the state of mind of a human being who is in

6   solitary confinement for more than 15 days dwarfs the

7   experiences of the defendant that is before the Court for

8   sentencing for his very serious conduct.  These remarks are

9   not made, Your Honor, as an excuse for Mr. Saleh's conduct,

10  both the underlying conduct, but certainly his conduct in the

11  Bureau of Prisons.

12           The Bureau of Prisons cannot function unless the

13  inmates have respect for and follow the rules.  And when they

14  don't, there has to be some type of consequence.  What that

15  is, Your Honor, I'm not qualified to say.  Nor am I qualified,

16  Your Honor, to speak on the psychological impact of long-term

17  incarceration in the special housing unit.  That's not my area

18  of expertise.  But those who are qualified talk about the

19  dangers to the human mind as a result of it.

20           I have looked closely, Your Honor, at the

21  disciplinary record here, and it is as woeful as Your Honor

22  has pointed out, and I think Your Honor might have missed one

23  or two.  Everything is here.  There are hundreds of

24  infractions dating back to 2015.

25           I think -- Mr. Bachrach, who is always on top of

Proceedings                                    14

1    these things, reminds me that within two weeks of Mr. Saleh

2    being at the MDC, he was at the Special Housing Unit and he

3    has remained there pretty much since that time.

4          His first serious infractions involving assaults and

5    fighting take place in April of 2016, when he was there about

6    nine months.  Before that time, you have the type of

7    violations that I think would not raise deep concerns, but

8    would raise concerns:  The failure to obey orders, failure to

9    stand, disobeying, letting other inmates use his phone, PIN

10   number, things of that nature.  After about nine months in

11   solitary confinement, we do begin to see the type of conduct

12   that is alarming.

13         Although the defendant's conduct over that time

14   period deteriorated, it never stopped myself or Michael

15   Bachrach or Steve Zissou from returning to the Court to try to

16   find the soul of a young man who is before the Court on quite

17   serious charges so that we could help him resolve these cases,

18   to accept responsibility for his conduct, and be in a position

19   where we can say something to the Court about him other than

20   what is set forth in the records, the BOP records and his

21   behavior in connection with the underlying offense.

22         So, Judge, that really comes down to this:  Before

23   his involvement and recruitment by ISIS, he was a member of a

24   loving family that you see in the courtroom today.  His father

25   is a hard-working man who came to this country and took full

Proceedings                                    15

1    advantage of the opportunities that are available.

2         Ali Saleh is loved by his family, who are a family

3    of law-abiding people, who have no contact whatsoever with

4    criminal justice at all.

5         Before his involvement here, we are told by his

6    family that Ali Saleh was a very quiet young man, spent most

7    of his time to himself, did not have a lot of friends, but was

8    always pleasant and amicable with people.  The parents feel

9    like they lost their son to the influence of other people and

10   they're heartbroken, as any parents would be, Your Honor,

11   because they recognize that Mr. Saleh has to be held

12   accountable for his conduct and they recognize that and they

13   respect that.  They have very strong religious beliefs.  They

14   have faith in God.  They have faith in who they are as parents

15   and I know that they will continue to provide that type of

16   support for him.

17        Mr. Saleh may not like for me to say it, but at his

18   core, he is a young man.  He is a young man who went astray.

19   He is a young man like many young men in this country who have

20   had their actions influenced by folks who are far more

21   powerful than them who seek out individuals to recruit for

22   their efforts.

23        Mr. Saleh has a very serious price to pay here, Your

24   Honor.  There are a lot of people who would describe him as

25   difficult.  I don't.  Complicated, yes.  Afraid, yes.

Proceedings                                    16

1    Courageous, yes.

2         I would say that both Mr. Bachrach and Mr. Zissou

3    have certainly appreciated the fact that Your Honor has

4    allowed us to stay on the case and to work with Mr. Saleh.  We

5    came into this case way into it and we recognized the

6    difficulties that were present and we -- the three of us

7    worked hard in tandem at times, oftentimes together, towards

8    seeing to it that Mr. Saleh, regardless of difficulties, had

9    the level of representation that this Court demands that he

10   has given all of the difficulties present.  And I feel very

11   comfortable, Your Honor, that we have accomplished that.

12        Your Honor, that concludes my remarks.

13        And I would like to just, if I can, just adopt those

14   same remarks for the proceeding that is to follow.

15        And I thank you, Your Honor, for the opportunity to

16   speak on his behalf.  And more importantly, I thank you for

17   the opportunity to represent him, because in our system, we

18   have to have lawyers who are prepared to go in even in the

19   most difficult cases and find that part of humanity that

20   exists in people who are charged before this Court.  It allows

21   us to maintain the integrity of what we are all seeking to

22   accomplish in courts and I know it is something that I am and

23   my colleagues are proud of.

24        THE COURT:  Thank you, counsel.

25        I will now hear from the assistant united states

Proceedings                                                17

1  attorney.

2           MS. KOMATIREDDY:  Thank you, Your Honor.

3           The most concerning thing about this defendant at

4  the time that he committed the charged offenses and even until

5  this day is that he is a true believer in ISIS and its violent

6  ideology, and its command, its directive to find the infidels

7  in whatever way that you can, wherever you are.

8           Counsel has suggested that Mr. Saleh's difficulties

9  are largely a result of solitary confinement that he has

10  experienced during his time at the MDC, but it is important to

11  point out a few things.  It is true that Mr. Saleh was put in

12  the SHU shortly after he started his pretrial detention, and

13  that's because of his conduct, his desire to fight against the

14  system, that is the system of what he considers to be the

15  infidels.  It was a disciplinary infraction on his part, in

16  particular, an attempt to circumvent the prison's monitoring

17  of jail calls by allowing someone else to use his telephone

18  privileges that resulted in that time --

19           THE defendant:  He didn't have any money in his

20  account and I --

21           THE COURT:  Be quiet.  Be quiet.  Continue, counsel.

22           MS. KOMATIREDDY:  Thank you.

23           The problem is that it didn't stop there.  Every

24  instant of the defendant being placed in the SHU was a

25  consequence for a rule or a violation on his part.  And

Proceedings                                              18

1   although counsel appropriately cites various studies and

2   concerns that are expressed by solitary confinement in

3   different incarceratory situations, none of that is specific

4   to this defendant.

5            Counsel talks about how some suffer hallucinations

6   or paranoia, but this Court has ordered evaluations of this

7   defendant over the years.  And those evaluations state that

8   this defendant does not suffer from hallucinations or

9   paranoia.

10           It is interesting that defense counsel spends a

11  great portion of their sentencing submission seeming to try to

12  explain all of the defendant's conduct.  As they say that the

13  only sensible explanation for the entirety of the defendant's

14  conduct in relation to the 2015 indictment, the 2018

15  indictment, and all institutional misconduct in between and

16  ever since is a result of his -- substantial impairments in

17  the defendant's decisionmaking ability brought about by

18  significant mental health impairments.  In other words, the

19  defense asks this Court to assume that all of the defendant's

20  criminal conduct is the result of mental illness.  But the law

21  does not support this presumption and the evidence in this

22  case shows otherwise.

23           It is very clear why the defendant does what he

24  does, because he believes in fighting the infidels.  He took

25  ISIS's call to heart and that call was specific.

Proceedings                                          19

1          In March of 2015, an ISIS recruiter told his

2    followers:  If you can't make hijra, that is travel to the

3    Middle East, don't sit at home and give up; ignite a bomb,

4    stab a kafir -- that's a disbeliever -- or shoot a politician.

5    If you came here, you would be on the frontline fighting,

6    right?  But you couldn't come here.  So why not fight the

7    kafir over there.  Your jihad is not over just because you got

8    stopped.

9          Those same sentiments are echoed by this defendant.

10   In the defendant's own Twitter feed, he posts I'm ready to die

11   for the caliphate.  Prison is nothing.

12         You see, it became clear to this defendant, after he

13   attempted to travel himself, after he sent money in support of

14   ISIS and others traveling to support ISIS, after he did

15   everything he could on the outside, spreading instructions

16   about how to create improvised explosive devices and acquiring

17   explosive --

18         THE defendant:  Molotov cocktails.  Molotov

19   cocktails.

20         THE COURT:  Be quiet or we will have to impose

21   conditions that secure you do not speak until the opportunity

22   is accorded to you in a few moments to speak.  You will be

23   able to speak to the Court in a few minutes, sir, and to say

24   anything you deem appropriate, as I said earlier, as I'm sure

25   as your distinguished counsel is telling you now.

Proceedings                                              20

1        So we will hear from the Government and then hear

2   from Probation and then, Mr. Saleh, we will hear from you.

3        As my children would have put it, chill out.

4        Go ahead, Counsel.

5        MS. KOMATIREDDY:  Yes, Your Honor.

6        In short, Your Honor, everything we see from this

7   defendant, it is his jihad.

8        As soon as the law enforcement officers stopped him

9   from hurting others in the outside world, he turned his

10  energies to hurting others while in prison.  That became

11  apparent from the very beginning.

12       At the time of his arrest, he asked the law

13  enforcement officers what took you so long?

14       During his post-arrest statement, he asked the law

15  enforcement officers to send him to prison, to send him to a

16  black site.  It became clear in that conduct when he refused

17  to be fingerprinted during processing, when he refused to

18  speak to a magistrate judge during arraignment, when he

19  initiated a hunger strike shortly after entering the prison,

20  and ever since, when he assaulted correction officers, set

21  fires in prison, hit emergency alarms in order to cause chaos.

22  Every single one of those actions in support of ISIS's

23  directive to fight the infidels.

24       This is not mental illness; it is ideology.  And the

25  most concerning thing is that this defendant continues to hold

Proceedings                    21

1   that ideology.  This Court has seen other ISIS supporters and

2   sentenced other ISIS supporters, and has seen how in certain

3   instances, after intervention, an individual can renounce that

4   ideology and turn a corner.  But this defendant has done the

5   opposite.  He has double-downed and he has found every

6   possible means to fight and continued that fight, continued

7   his jihad.

8            Because this conduct requires retribution,

9   deterrence and incapacitation, the Government requests a

10  guidelines sentence.

11           THE COURT:  Thank you, counsel.

12           Does Probation have a statement to make?

13           THE PROBATION OFFICER:  No, Your Honor.

14           THE COURT:  All right.  Mr. Saleh, what, if

15  anything, would you like to say to this Court?

16           MR. RICCO:  I'm sorry, Your Honor, he had a question

17  that I answered.

18           THE COURT:  Mr. Saleh, what, if anything, would you

19  like to say to the Court?  You don't have to.  It is up to

20  you.

21           THE defendant:  In the name of Allah, the most

22  merciful, the most kind --

23           (Defendant speaking foreign language.)

24           THE defendant:  Indeed, all praises to Allah.  We

25  praise Him and we seek His aid and forgiveness.  Whomsoever

```
                    Proceedings                       22
```

1   Allah guides, no one can misguide.  And we seek refuge in

2   Allah from the evil of ourselves and our evil deeds.

3   Whomsoever Allah guides, no one can misguide, and whomsoever

4   Allah misguides, no one can guide --

5               (Defendant speaking foreign language.)

6               THE defendant:  All of you who believe --

7               (Defendant speaking foreign language.)

8               THE defendant:  Fear Allah, as He should be feared --

9               (Defendant speaking foreign language.)

10              THE defendant:  And do not die except in a state of

11  Islam submission.  All mankind, fear your guardian Lord who

12  created you from one sole and from that sole, Adam, he created

13  its mates, Hawa, Eve.  And from them both, he scattered many

14  men and woman --

15              (Defendant speaking foreign language.)

16              THE defendant:  And fear Allah through whom you

17  demand your mutual rights and do not cut the ties of kinship.

18  Indeed, Allah is ever a watcher over you.  Allah says --

19              (Defendant speaking foreign language.)

20              THE defendant:  All of you who believe, fear Allah

21  and say a word that is right, that is just, that is firm.

22              (Defendant speaking foreign language.)

23              THE defendant:  He will correct your affairs and

24  forgive you your sins --

25              (Defendant speaking foreign language.)

Proceedings                                                  23

1         THE defendant:  And whoever obeys Allah in His

2    messenger, then indeed He has achieved a great achievement.

3              As to what follows, and, indeed, the best speech is

4    the book of Allah's Al Quran, and the best guidance is the

5    guidance of --

6              (Defendant speaking foreign language.)

7         THE defendant:  Peace and blessing be upon Him in

8    the words of affairs are those newly invented matters for

9    every newly invented matter is an innovation and every

10   innovation is misguidance in religion and every misguidance

11   leads to the fire.

12             As to what follows, I wanted to respond to a

13   statement and I wanted to recite a chapter of the Koran by the

14   judge a couple years ago when he said that he was agnostic

15   when it came to the affairs of prison, and I didn't want to

16   respond to what happened in prison, but I just want to respond

17   to the word agnostic, and I wanted to recite a chapter so that

18   my family can hear as well --

19             (Defendant speaking foreign language.)

20        THE defendant:  The most merciful --

21             (Defendant speaking foreign language.)

22        THE defendant:  He taught the Koran.  He created

23   mankind --

24             (Defendant speaking foreign language.)

25        THE defendant:  He taught how to speak.  He taught

Proceedings                    24

1    him the language --

2             (Defendant speaking foreign language.)

3             THE defendant:  The son and the moon are all

4    accounted for --

5             (Defendant speaking foreign language.)

6             THE defendant:  And the stars and the planets, they

7    prostate to Him, and the Heavens he raised --

8             (Defendant speaking foreign language.)

9             THE defendant:  And he made just the balance --

10            (Defendant speaking foreign language.)

11            THE defendant:  So do not transgress in the

12   balance --

13            (Defendant speaking foreign language.)

14            THE COURT:  Mr. Ricco, would you agree that this

15   completes your client's statement to the Court?

16            MR. RICCO:  I would, Your Honor.

17            THE COURT:  Thank you, Mr. Saleh.

18            THE defendant:  I wanted to finish up.

19            THE COURT:  You're finished.  I thank you.

20            MS. KOMATIREDDY:  Your Honor?

21            THE COURT:  Yes.

22            MS. KOMATIREDDY:  May I just ask that the defendant

23   be advised should he wish any of his Arabic language remarks

24   to be considered by the Court that they should be repeated in

25   English.

Proceedings                                                    25

1          MR. RICCO:  Your Honor, we know how to handle this.

2          THE COURT:  I'm sorry?

3          MR. RICCO:  I'm sorry.  We don't need any guidance

4    from the Government as to how to handle this.

5          THE COURT:  Speak into the microphone.

6          MR. RICCO:  Yes.  We don't need the guidance from

7    the Government how to handle this.  We will advise the

8    defendant.  And we will try our best to get to the court

9    reporter those sections of the Koran that he was referring to.

10   Most of it, Your Honor, is Chapter 55, and we will do our best

11   to make sure that the Court has an accurate record of it.

12         THE COURT:  Inshallah.

13         MR. RICCO:  Inshallah.  Thank you.

14         THE COURT:  The Court may have understood a lot more

15   than some people might think the Court understood.

16         All right.  Thank you, Mr. Saleh.

17         The Court has this to say:

18         Perfect justice in this case would involve a power

19   that neither I nor any judge nor any human being, for that

20   matter, has in his or her hands.  It is challenging and

21   humbling to sit here as the Court and to pass sentence on a

22   fellow human being.

23         This case impacts your family, who are here today in

24   support, and the Court acknowledges them and blesses them for

25   their support throughout.  And the Court acknowledges the

Proceedings                                        26

1    efforts that the family made prior to 2015 to prevent many of

2    the actions that occurred, including taking steps to secure

3    the passport to prevent the defendant from leaving the country

4    and perhaps, by taking those steps, saved his life.

5            I do not want you to think that I have not seen

6    every step that the men and women, family members took to

7    protect Mr. Saleh went unnoticed or unappreciated.  You are

8    the reason he is still alive.  God has blessed you, your

9    family, and the steps that you have taken to keep him alive

10   and to protect him and all citizens throughout the world, not

11   just in this country, but throughout the world, from the evils

12   of ISIS.  You are to be commended for that.  You are to be

13   commended for that.

14           We are all limited human actors.  And in my faith

15   division, we are all sinners.  I get that.  We all get that.

16   And you are to be commended for your steps.

17           But, ultimately, although this case impacts your

18   family and this case impacts the victims of your crimes and

19   the intended victims of your crimes, ultimately this case is

20   about you.  This case is about what you did that brought us

21   here today, which is a day of sadness and a day of tragedy.

22           We will, of course, have the entirety of your

23   comments, Mr. Saleh, translated and made a part of the record

24   of this proceeding.  And you should be comforted in knowing

25   that, and your family should be comforted in knowing that as

Proceedings                                    27

well.

I'm going to read the Memorandum and Order in this case which details the history of this case, both the law and the facts, and then we're going to briefly adjourn this proceeding.  We will have another court reporter come in and we will do the second proceeding.

On July 24th of 2018, the defendant, Mr. Ali Saleh, pled guilty pursuant to a written plea agreement to two counts of attempting to provide material support to a foreign terrorist organization in violation of Title 18 of the United States Code Section 2339B(a)(1).  The Court hereby sentences this defendant and sets forth its reasons for the defendant's sentence using the mandatory rubric of 18 U.S.C. Section 3553(a) factors pursuant to 18 U.S.C. Section 3553(c)(2).

And I want all counsel and all parties present to know that I will be filing this Memorandum and Order in its entirety on ECF at the end of these proceedings today.  So feel free to take notes, but you will have the entirety of this Memorandum and Order.  But I'm going to read it so that all of the people here today, including the defendant, hear it in realtime.

The legal standard of 18 U.S.C. Section 3553 outlines the procedures for imposing sentence in a criminal case.  The starting point and the initial benchmark in evaluating a criminal sentence is the guidelines sentencing

Proceedings                          28

1   range pursuant to *Gall versus United States*, 552 U.S. 38, at

2   page 49, decided in 2007.  If and when a district court

3   chooses to impose a sentence outside a Sentencing Guidelines

4   range, the Court shall state in open court the reasons for its

5   imposition of the particular sentence and the specific reason

6   for the imposition of a sentence different from that described

7   in the guidelines.  The Court must also state with specificity

8   its reasons for so departing or varying in a statement of

9   reasons form.

10           The sentencing court's written statements of reasons

11  shall be simple, fact-specific statement explaining why the

12  guideline range did not account for a specific factor or

13  factors under Section 3553(a) pursuant to the decision of my

14  late esteemed dear colleague Jack Weinstein, *United States*

15  *versus Davis*, 08-CR-0332, 2010 Westlaw 1221709 at star 1

16  decided here in the Eastern District on March 29 of 2010.

17           Section 3553(a) provides seven factors for the Court

18  to consider in determining what sentence to impose on a

19  criminal defendant and the Court now addresses each in turn,

20  beginning with the nature and circumstances of the offense and

21  the history and characteristics of the defendant.

22           The first 3553(a) factor requires this Court to

23  evaluate the nature and circumstances of the offense and the

24  history and characteristics of the defendant.

25           The defendant was born on December 18 of 1992 in

Proceedings                                    29

1   Queens, New York.  He is one of four children born to the
2   marriage of Mr. Saleh Musa and Ms. Fatimah Musa.  The
3   defendant's father owns a grocery store and works as a
4   security guard for a company that delivers money to automatic
5   teller machines.  His mother is a homemaker.  The defendant
6   has good relations with his parents and they remain supportive
7   of him throughout the incarceration and despite the
8   incarceration of the instant offense and the Court appreciates
9   that support.
10          In telephonic interviews, the defendant's parents
11  have described him as a good kid and expressed a profound
12  sense of sadness over his legal situation, a sentence that the
13  Court shares.  The defendant's siblings are also aware of the
14  instant offense and remain supportive.
15          The defendant described growing up in a home with
16  basic necessities, free from any instance of abuse or neglect.
17  He graduated from Hillcrest High School in Queens in 2010,
18  attended City College in New York in January 2011 through May
19  2011, when he was 21 years old, and he attended La Guardia
20  Community College from March of 2013 until June of 2014.
21          And prior to his incarceration, the defendant was
22  employed as a deli clerk in his father's grocery store and as
23  a cashier at his uncle's restaurant and was otherwise
24  supported by his parents in a nurturing and supportive way.
25  Between December 2014 and July of 2015, the defendant lived

Proceedings                                                    30

1    with his uncle in Fort Wayne, Indiana.  And prior to his

2    arrest in the case, the defendant lived with his parents in

3    Queens, New York.

4            The defendant is single, has never been married, has

5    no children.

6            The defendant is generally in good physical health,

7    other than minor problems, including a vitamin deficiency and

8    low blood pressure.  During his incarceration for the instant

9    offense, he has been treated in connection with a hunger

10   strike and has been taken to the hospital for a drug overdose

11   that was deemed accidental and/or unintentional.

12           The defendant has undergone comprehensive

13   psychological evaluation since his arrest, as we've heard

14   today from his counsel and the Government.  The results of

15   these evaluations have been inconclusive in determining the

16   defendant's specific mental health issues.  Defense counsel

17   argues the defendant's offense resulted from substantial

18   impairments in Mr. Saleh's decisionmaking ability brought

19   about by significant mental health impairments.  That's set

20   forth in the defendant's sentencing memorandum at 8, ECF No.

21   157, paragraphs 84 through 90.  The defendant has declined

22   psychological services while in prison according to the PSR in

23   paragraph 84.

24           In approximately 2013, the defendant became

25   interested in the conflict in Syria, specifically in ISIS.  At

Proceedings                                                    31

1   the time of the defendant's offense conduct, ISIS was pursuing

2   the objective of establishing an Islamic state or caliphate

3   based in the Middle East.  As stated earlier, ISIS is widely

4   recognized as one of the preeminent threats in the world

5   today, responsible for more deaths than any terrorist

6   organization or extremist group over the past several years.

7   ISIS routinely carried out killings; deliberately targeting

8   civilians; mass executions; persecution of individuals of

9   communities on the basis of their religion, nationality, or

10  ethnicity; kidnaping of civilians; forced displacement of Shia

11  Muslim communities and minorities; killing and maiming

12  children; rape; and other forms of sexual violence.  The

13  defendant swore an oath of allegiance to ISIS and decided to

14  travel to the Middle East in support of ISIS.

15          The defendant espoused his support for ISIS through

16  multiple public online forums.  He had at least nine Twitter

17  accounts, as well accounts on Facebook, Kik, and Telegram,

18  and over the course of one year, he posted and reposted

19  hundreds of messages glorifying ISIS, promoting violent jihad,

20  spreading ISIS propaganda, supporting ISIS objectives.  During

21  this time, one of the photographs associated with defendant's

22  Twitter account was a photograph known to be an ISIS

23  recruitment billboard in Iraq.

24          The defendant made efforts to facilitate others in

25  support of ISIS.  Through his social media accounts, he held

Proceedings                                                    32

1    himself out to be someone who would assist others who wanted

2    to make "hijra," travel, and join ISIS in the Middle East.

3    Defendant chose Twitter usernames that included hijra_sponsor

4    and sponsormujahid; translated:  Travel sponsor and sponsor a

5    fighter.  When other ISIS supporters contacted the defendant

6    on Twitter with his assistance to travel to ISIS-controlled

7    territories, he provided them with contact information for

8    ISIS facilitators who could help or redirect them to contact

9    him using encrypted-messaging services.

10          With respect to his attempts to travel to the Middle

11   East in support of ISIS fighters, the record is replete.

12          The defendant was arrested after repeatedly

13   attempting to travel to the Middle East to become a foreign

14   fighter for ISIS.  He first attempted to join ISIS in August,

15   August 28th of 2014, when he made an airline reservation from

16   New York to Turkey, the country bordering on Syria.

17          After that failed attempt, the defendant ordered a

18   fire starter knife and folding knife from Amazon, as well a

19   book title, "Messages to the World:  Statements of Osama Bin

20   Laden."  On twitter, he retweeted, "Do not ask for anyone's

21   advice and do not seek anyone's verdict.  Kill the disbeliever

22   whether he is civilian or military," and tweeted, "Get close

23   to the real kuffar and assassinate them."

24          On October 2014, the defendant communicated with an

25   ISIS supporter in Mali through an online messaging platform

Proceedings                                           33

and sent a wire transfer in the amount of $500 to fund that
person's travel to Syria.  During the same time period, the
defendant communicated with other individuals to facilitate
their support of ISIS, including known ISIS supporters in the
United Kingdom and Australia.

          In July of 2015, the defendant purchased fireworks
containing 1,196 grams of low-explosive powder, hid them in a
concealed compartment in the trunk of his car and drove them
from Indiana towards New York City.  On Defendant's phone, law
enforcement agents discovered instructions regarding how to
create a bomb using explosive powder from fireworks.  The
fireworks the defendant possessed was sufficient to create
multiple soda can grenades analogous to the one depicted in
the instructions and in online posts by the defendant.  They
were also sufficient to create pressure-cooker bombs described
in the instructions.  As the defendant drove toward New York
City with those explosive materials in his trunk, his car
broke down and he was forced to have it towed.  In addition to
the fireworks, law enforcement officers found a tactical knife
located inside the car.

          In 2015, the defendant rededicated his efforts to
join ISIS overseas.  He made at least five separate attempts
over 10 days to travel to the Middle East to fight ISIS.

          On July 24, 2015, he contacted an ISIS facilitator
in Lebanon who had instructed followers to contact him on the

Proceedings                                        34

1    encrypted platforms for Kik and Telegram for hijra, travel

2    advice, to IS in Libya only.  The defendant then made a same

3    day one-way booking to travel on Qatar Airways from New York

4    JFK to Doha, Qatar, then on to Cairo, Egypt.  Notably, Egypt

5    and Libya are bordering countries and it was relatively common

6    at the time for individuals to travel to Egypt to Libya to

7    join ISIS.  When the defendant attempted to pay for the flight

8    at the JFK ticket counter, he was declined.  Later that

9    evening, the defendant attempted to buy tickets to Egypt at

10   Newark Liberty Internation Airport in Newark, New Jersey, but

11   was also declined.

12          On July 26th of 2015, the defendant reserved a

13   flight itinerary for a same day one-way departure on Qatar

14   Airways from Philadelphia International to Cairo, Egypt.  When

15   the defendant attempted to obtain a boarding pass, he was

16   denied.  The next day the defendant went to Indianapolis

17   International Airport in Indiana, and appeared to again

18   inquire into flights.  He left the airport without making any

19   reservations.

20          Finally, on August 2nd of 2015, the defendant went

21   to Amtrak train station in Cleveland, Ohio and attempted to

22   take a train Toronto, Canada, where he intended to fly from

23   Toronto to Yemen.  After law enforcement intervention, he did

24   not board the train to Toronto and instead returned to New

25   York City.

Proceedings                                          35

1          On September 17th of 2015, law enforcement agents

2   arrested the defendant at his home.  During a search of his

3   home, the agents recovered paper copies of an itinerary and a

4   Turkish visa issued in the defendant's name for his September

5   2014 attempt to travel and the duffle bag containing

6   flashlights, headlamps, and other survival gear.  Agents also

7   recovered a black trunk containing 29 machetes near the

8   defendant's sleeping area.  The defendant acknowledged his

9   Miranda rights but was generally uncooperative in his

10  post-arrest interview.

11         The defendant has been in detention at the MDC since

12  September of 2015.  And as detailed in the pre-sentence

13  report, the defendant has been cited on at least 100 separate

14  occasions for committing disciplinary infractions, many of

15  which involved acts of violence.

16         In October of 2015, the defendant was cited for

17  giving and accepting money without authorization because his

18  personal identification number was used by another inmate to

19  place calls, removing handcuffs from his left hand and

20  slipping out of his waist chain and attempting to conceal the

21  restraints by covering his arms with a blanket and refusing to

22  consent to a visual search.

23         In November of 2015, the defendant was cited for

24  refusing to consent to a visual search and refusing to appear

25  at his disciplinary hearing; being unsanitary and untidy and

Proceedings                                              36

1   refusing to obey an order for refusing to comment during his

2   disciplinary hearing; being disruptive and barricading his

3   cell window with his mattress in order to obstruct the view of

4   his cell from the staff, disobeying the staff when they asked

5   him to remove the obstruction; and hitting the distress alarm

6   button and jamming the alarm button in the Special Housing

7   Unit, the so-called SHU, which you have heard about today.

8           In December of 2015, the defendant was cited for

9   multiple instances of refusing to attend his disciplinary

10  hearings and refusing to be searched in the SHU.

11          In June of 2016, the defendant was cited for failing

12  to stand for a prison count and refusing to obey an order to

13  do so, refusing to obey an order because he was found in a

14  common area with a sweatshirt and a sheet wrapped around him;

15  being in an unauthorized area during a lockdown drill;

16  refusing to remove sheets of paper from his cell window;

17  blocking his cell window and cell slot with paper in order to

18  obstruct the view from staff; refusing to remove the paper

19  when ordered to do so, not complying when asked to submit to

20  restraints; and activating the SHU distress alarm multiple

21  times when there was, in fact, no emergency.

22          On one occasion BOP staff found the defendant's food

23  slot opened.  As the BOP officer began to secure the food

24  slot, the defendant charged the food slot from the back of his

25  cell which resulted in the bar smashing into the officer's

Proceedings                                37

1    knee multiple times.  When the defendant was ordered to stop

2    movement, he refused to do so.  Several months later, as BOP

3    staff were attempting to photograph the cell, the defendant

4    kicked the BOP officer in his mid-section, which resulted in

5    redness and swelling of his torso.

6               In July and August of 2016, the defendant was cited

7    for refusing to attend his disciplinary hearing multiple

8    times; covering his cell window in SHU, refusing to remove the

9    covering and jamming the food slot with a plastic bag;

10   covering his cell window in the SHU again; activating the

11   duress alarm repeatedly and kicking a BOP officer in the upper

12   torso during a pat-down search.

13              In September of 2016, the defendant was cited for

14   covering his cell window in the SHU; refusing to attend

15   disciplinary hearings multiple times; breaking food slots

16   multiple times; refusing to stop pulling on a light fixture

17   while standing on the top bunk and attempting to kick BOP

18   officers when they removed him and placed him against the

19   wall; destroying property valued at $100 or less for ripping

20   the plastic cover of his mattress.

21              In October 2016, the defendant was cited for

22   fighting with another inmate, refusing to remove a covering

23   from his cell window; refusing to attend a disciplinary

24   hearing for destroying the light fixture in his room and

25   removing a metal desk from the wall in his SHU.

Proceedings                                    38

1          Additionally, the defendant was cited for banging on

2     his cell window with a small stool seat that he had broken off

3     from his cell table, damaging the food port block on his cell

4     door and shattering the glass window.  The defendant, still

5     holding the stool seat, told officers "I'm going to hit

6     whoever comes in here with this."  He continued to be

7     combative and threatened to kick officials as they tried to

8     subdue him in the MDC.

9          In December of 2016 and January 2017, the defendant

10    was cited for refusing to remove paper covers from his cell

11    windows in the SHU multiple times; refusing to attend

12    disciplinary hearing multiple times, possessing a dangerous

13    weapon, i.e., a broken piece of his plastic food tray in his

14    hand; placing of his arm inside the food slot at the SHU and

15    fighting with another person.

16         In April of 2017, the defendant was cited for

17    attempting to grab the duty belt of the officer through a food

18    slot in his Special Housing Unit cell; refusing to be placed

19    in restraints multiple times and kicking an officer in the

20    thigh and hitting him in the back of his head during a routine

21    pat-down search.

22         In June and August of 2017, the defendant was cited

23    for assaulting someone without serious injury multiple times;

24    destroying property valued at over $100 multiple times;

25    refusing to obey an order, possessing a dangerous weapon;

Proceedings                                             39

1    fighting with another person.

2              In September and October of 2017, the defendant was

3    cited for refusing to obey on order; assault multiple times

4    with and without serious injury, interfering with taking

5    count; setting a fire and possessing a dangerous weapon.

6              In November 2017, the defendant was cited for

7    destroying property and refusing to appear for his

8    disciplinary hearing.  The defendant was also cited for

9    possession of a dangerous weapon, destroying Government

10   property, tampering with security devices, covering his cell

11   window in the Special Housing Unit.  BOP staff also observed

12   him banging and kicking on the door repeatedly.  When he

13   uncovered the window, he was in possession of a large metal

14   object from the light fixture which he used to bang on the

15   door.  The defendant was thereafter placed in restraints and

16   removed from his cell.  Upon inspection of his cell, BOP

17   security officers observed that there were screws from light

18   fixture and the light bulb removed and his desk attached to

19   the wall was damaged.

20             In December 2017 and January 2018, defendant was

21   cited for interfering with taking count; refusing to appear at

22   disciplinary hearings; destroying property; and assaulting

23   someone without serious injury.

24             In March of 2018, the defendant was cited for

25   assault without serious injury multiple times.  On one

Proceedings                                    40

1  occasion, the defendant through an unknown substance through

2  an open food slot in the Special Housing Unit.  He thereafter

3  refused to close the food slot stating "I want my sheet, I

4  want my sheet."  On another occasion staff observed the

5  defendant attempting to destroy the ceiling tiles.  Staff

6  attempted to remove the defendant to another cell.  He became

7  combative, struck an officer in the head and torso with his

8  closed fist.  He then refused to appear at his disciplinary

9  hearing.  Defendant was also cited for refusing a drug/alcohol

10 test.

11         On April 24, 2018, the defendant was cited for

12 possessing a dangerous weapon and assault without serious

13 injury.  According to the BOP disciplinary hearing report, an

14 inmate was observed with superficial lacerations on the left

15 forearm that were consistent with being cut with a sharp

16 object.  While investigating this incident, BOP staff

17 discovered the defendant had recently gone through a metal

18 detector, which revealed a two-inch piece of aluminum metal

19 located on his person, and it was determined that he used this

20 metal object to assault the other inmate.  The defendant then

21 refused to appear at the disciplinary hearing.

22         On July 13, 2018, the defendant was cited for

23 possessing a dangerous weapon and assaulting a BOP officer

24 with a knife.  This was the incident for which the defendant

25 was indicted in docket 18-CR-468, which we will consider

Proceedings                                        41

1   immediately after this proceeding.

2           In August, October, and November of 2018, the

3   defendant was cited for refusing to obey orders; destroying

4   property, and possessing a dangerous weapon.

5           In March and April of 2019, the defendant was cited

6   for interfering with security devices, destroying property and

7   possessing a dangerous weapon.

8           In May of 2019, the defendant was cited for

9   destroying property valued at $100 or less when he bent his

10  handcuff and took it off.

11          In February, March, and May of 2020, the defendant

12  was cited for possessing a dangerous weapon.

13          In September, October, November, and December 2020,

14  defendant was cited for destroying property on multiple

15  occasions; possessing a dangerous weapon; assaulting without

16  serious injury; setting a fire; refusing to obey on order, and

17  interfering with taking count of inmates.

18          In January through May of this year, 2021, the

19  defendant has been cited for assaulting someone without

20  serious injury on multiple occasions; refusing to obey orders

21  multiple times; possessing dangerous weapon; interfering with

22  security devices on many occasions; refusing to obey orders,

23  and destroying property over $100 in value.

24          The second 3553(a) factor addresses the Court to

25  consider the need for the sentence imposed to reflect the

Proceedings                                          42

1   seriousness of the offense, promote respect for the law, and

2   to provide just punishment for the offense; to afford adequate

3   deterrence to criminal conduct; to protect the public from

4   further crimes of the defendant; and to provide the defendant

5   with needed educational or vocational training, medical care,

6   or other correctional treatment in the most effective manner.

7          The Court's sentence recognizes the seriousness of

8   the defendant's offenses and punishes the defendant

9   accordingly.  It seeks to deter the defendant from further

10  criminal activity, from disregarding United States law, and

11  from engaging in illicit activity.

12         The third 3553(a) factor requires the Court to

13  consider the kinds of sentence available with respect to this

14  defendant pursuant to 18 U.S.C. Section 3553(a)(3).

15         The defendant pled guilty, pursuant to the plea

16  agreement, to Counts Two and Three of the superseding

17  indictment, charging the defendant with attempt to provide

18  material support to a foreign terrorist organization violating

19  18 U.S.C. Section 2339B(a)(1).

20         For Count Two, the defendant faces a statutory

21  maximum imprisonment term of 15 years pursuant to 18 U.S.C.

22  2339B(a)(1).

23         For Count Three, the defendant faces the statutory

24  maximum prison term of 20 years pursuant to 18 U.S.C. Section

25  2339B(a)(1)(2015).  On both Counts Two and Three, defendant

Proceedings                                          43

1    faces a statutory maximum of life imprisonment, pursuant to 18

2    U.S.C. Section 3583(j), per count to be served concurrently; a

3    fine of up $250,000 pursuant to 18 U.S.C. Section 3571(b), per

4    count; and a mandatory special assessment of $100 pursuant to

5    18 U.S.C. Section 3013, per count.

6              The fourth 3553(a) factor requires the Court to

7    discuss the kinds of sentence and the sentencing range

8    established for the applicable category of offense committed

9    by the defendant as set forth in the guidelines.

10             Now, the parties disagree, as I previously noted, as

11   to whether the Defendant's total offense level in this case

12   comes to the competing counts.

13             One side says Docket Number 15-CR-517 should be

14   grouped with a total offense level in Docket Number 18-CR-468.

15   While the instant case concerns the Defendant's attempt to

16   join to support ISIS, Docket Number 18-CR-468 concerns his

17   assault of prison guard using a contraband knife.

18   Accordingly, the Court will, as proposed by the Government,

19   treat each case as a separate proceeding and sentence the

20   defendant separately in each case.

21             Despite Probation's grouping of the total offense

22   level in the pre-sentence investigation report and defense

23   counsel's request to consolidate the proceedings, as I have

24   stated, the Government notes that they do not have and they do

25   not consent to consolidate the proceedings.  And I think the

Proceedings                                      44

1   record is clearer by doing them seriatim, as I've indicated

2   earlier and which I'm doing.

3           The purpose of the grouping rule as set forth in

4   Part 3D in the sentencing guidelines is to prevent multiple

5   punishments for substantially identical conduct.  This is not

6   the case here.  Accordingly, the Court proceeds to sentence

7   the defendant separately under each indictment.

8           The applicable guideline for a violation of 18

9   U.S.C. Section 2339B(a)(1) is USSG Section 2M5.3(a), which all

10  parties agree provides a base offense level of 26.  The

11  parties also agree that because the defendant transported

12  1,196 grams of explosive powder in a concealed compartment in

13  the trunk of his car during the instant offense, two levels

14  are added.

15          The parties also agree that because the offense is a

16  felony that involved or was intended to promote a federal

17  crime of terrorism, the offense level is increased by 12.

18          Further, the Government and defense counsel agree

19  that the defendant's acceptance of responsibility results in a

20  three-level reduction.  Probation, however, groups the

21  offenses in this case and 18-CR-468.  They do not credit the

22  defendant with this reduction because after his arrest, he has

23  continued to commit crimes and infractions in prison under

24  their view.  Therefore, the defendant's total offense level

25  according to the Government and the defense is 37.  The

Proceedings                                    45

1    defendant's total offense level according to Probation would

2    be 40.

3            The parties agree the defendant has a Criminal

4    History Category of six.  Because the defendant has, as I

5    previously stated, no known prior criminal conviction, his

6    criminal history category score is zero, which generally

7    establishes a Criminal History Category of One.  However,

8    because the instant offense is a felony that involves or was

9    intended to promote a federal crime of terrorism, the

10   defendant's criminal history category is automatically a

11   category six, pursuant to USSG Section 3A1.4(b).

12           A total offense level of 37 or 40, with a Criminal

13   History Category of six, yields a guidelines imprisonment

14   range of 360 months to life.  However, because of the

15   statutory maximum sentence, the effective Guidelines range is

16   360 to 420 months of imprisonment.  Additionally, the

17   Guidelines range further suggests a term of supervised release

18   of one year to life; a fine of between 50,000 and $500,000,

19   and notes the defendant is ineligible for Probation.

20           The U.S. Probation Department recommends a sentence

21   of 15 years of custody on Count Two, 20 years of custody on

22   Count Three to run consecutively; 15 years of supervised

23   release to run concurrently on each count, and the special

24   conditions outlined in their sentencing recommendation.

25           The Government recommends a guidelines sentencing

Proceedings                                          46

1    range of between 360 and 420 months and notes the defendant

2    consented to the imposition of a term of lifetime supervised

3    release in the plea agreement.

4         Defense counsel has not asked the Court for a

5    specific sentence, as I noted earlier, but instead asks for a

6    sentence of not more than 300 months on both this indictment

7    and the indictment brought under 18-CR-468.

8         The Fifth 3553 factor requires this Court to

9    evaluate any pertinent policy statement issued by the

10   Sentencing Commission.  The Sentencing Commission outlines

11   grounds for departures from a Guidelines sentence in some

12   circumstances.  Defense counsel argues a downward departure

13   from the Guidelines is warranted in this case for three

14   reasons:  First, Mr. Saleh has significant mental health

15   issues, which would be better served by psychiatric treatment

16   rather than prolonged incarceration or isolation.

17        Second, Mr. Saleh's condition and his conduct have

18   been far from stellar, they acknowledge, but they state it is

19   likely the result of detaining the defendant, who has

20   significant mental health issues, in their view, in the MDC

21   Special Housing Unit, the SHU, often in isolation, as we've

22   heard for thousands of days.

23        And third, while the intent of Mr. Saleh's crimes,

24   they acknowledge, was odorous, his ability to succeed in

25   completing them was disorganized, confused, and disconcerted

Proceedings                                          47

1   because of his mental situation.

2          Now, the defendant further argues that 300 months or

3   25 years is a lengthy and substantial sentence and that

4   individuals charged with gang and organized crime-related

5   murders, including MS-13, the Bloods, the Crips, the Mafia,

6   often receives sentences in this District in the 20- to

7   25-year range, even when multiple murders are proven beyond a

8   reasonable doubt.  The defense argues that the defendant's

9   institutional conduct reflect the conclusion that Mr. Saleh

10  possesses a Schizotypal Personality Disorder.  That is the

11  statement of Dr. Xenakis, manifested by bizarre and odd

12  thinking, unusual and idiosyncratic interpretations of events

13  and situations, and episodic and overwhelming distress and

14  dysphoria.  Defense counsel claims this condition was extended

15  and exacerbated by the defendant's placement in solitary

16  confinement.

17         Additionally, defense counsel argues the defendant

18  has been exposed to absolutely abhorrent conditions of

19  confinement during the past six years, including multiple

20  blackouts, flooding, mold in his cell, lack of heat, and most

21  recently, disruption of food services and deprivation of basic

22  sanitary conditions, such as cleaning supplies to the cells

23  despite COVID 19 raging alarmingly through the jails.

24         Defense counsel does not dispute the disciplinary

25  struggles Mr. Saleh has had while detained at the MDC, but

Proceedings                                                    48

1   states the treatment he has received cannot be justified by

2   anything he is alleged to have done.  Moreover, defense

3   counsel calls attention to a recent incident in which the

4   defendant, upset at his prayer book being dropped, kicked the

5   officer standing behind him, an officer with whom defendant

6   had a history of negative verbal interactions.

7          Defense counsel states that the officer responded by

8   throwing Mr. Saleh against the metal door to his cell so hard

9   that he had to be transported to an outside hospital.  Mr.

10  Saleh's injury included two puncture wounds to the skull,

11  measuring approximately one-half centimeter to one centimeter,

12  and substantial swelling of his face that impacted his ability

13  to eat and to speak.  In light of these circumstances, defense

14  counsel argues a sentence of no more than 300 months

15  imprisonment in this proceeding should be imposed and the

16  proceeding in 18-CR-468 would be sufficient but not greater

17  than that to achieve the goals set forth in 18 U.S.C. 3553(a).

18         In contrast, Probation provides that, and seeks, an

19  upward departure may be necessary because of the defendant's

20  multiple violent assaults at the MDC and against its officers

21  while in custody, which he was not charged with in Docket

22  Number 18-CR-468.  Probation states that his behavior

23  constitutes additional criminal activity for which the

24  defendant is not held accountable in the advisory guidelines

25  calculation, and may warrant an upward departure pursuant to

Proceedings                                                   49

1    USSG Section 5K2.21.

2            Moreover, Probation notes that because of the

3    grouping rules, the additional conviction on the assault

4    charges resulted in no charge from the original advisory

5    guideline range.  As a result, this range may not provide

6    ample and appropriate additional punishment for the assault

7    conduct.  The Court may consider this as a basis for departure

8    if it wishes to do so pursuant to the background in the

9    commentary of USSG Section 3D1.4.  Because the Court is

10   conducting separate sentencings, this factor is not relevant.

11           Next is the need to avoid unwarranted sentence

12   disparities.  This is the sixth 3553(a) factor requiring the

13   Court to consider the need to avoid unwarranted sentence

14   disparities among defendants with similar records who are

15   found guilty of similar conduct, 18 U.S.C. Section 3553(a)(6).

16   For the reasons stated in this Memoranda and Order and

17   considering the other six 3553(a) factors, the Court's

18   sentence in this case avoids unwarranted sentence disparities.

19           The final and seventh 3553(a) factor requires this

20   Court to touch upon the need to provide restitution to any

21   victims of the offense.  In the Court's view, this factor 18

22   U.S.C. 3557(a)(7), is not relevant to this case.

23           Therefore, given the nature of the offense and the

24   circumstances, the Court imposes a sentence of 360 months of

25   incarceration, which is the bottom of the Guidelines range,

Proceedings                                    50

1    and lifetime supervised release, which was agreed to in the

2    plea agreement, and find that this is sufficient but not

3    greater than that necessary to comply with the purposes set

4    forth in 18 U.S.C. Section 3553(a).

5             Ordinarily, there would be a fine imposed of between

6    5,000 and 500,000.  It's optional.

7             Probation reports the defendant appears unable to

8    pay such a fine.  The Court agrees.  So no fine is being

9    imposed.

10            The defendant shall pay the mandatory assessment of

11   $100 per count, which I am required to impose in all cases.

12   The Court hereby adopts the factual findings of the

13   pre-sentence investigation report and its addenda, barring any

14   errors contained therein and to the extent they are not

15   inconsistent with the Court's sentencing.

16            The Court also adopts the special conditions

17   recommended by the Probation Department.  The Court will now

18   read those special conditions out loud into the record so

19   there is no confusion about what they are.

20            The defendant shall participate in an education or

21   vocational training program as selected by the Probation

22   Department.

23            The defendant shall participate in a mental health

24   treatment program as approved by the Probation Department.

25   The defendant shall contribute to the cost of such services

Proceedings                                    51

1  rendered and/or any psychotropic medications prescribed to the

2  degree he is reasonably able to do so and shall cooperate in

3  securing any applicable third-party payment.  The defendant

4  shall disclose all financial information and documents to the

5  Probation Department and assess his ability to pay.

6          The defendant shall comply with the medication

7  regime prescribed by a licensed psychiatrist approved by the

8  Probation Department.  The defendant shall contribute to the

9  cost of such services rendered and any psychotropic

10 medications prescribed by a co-payment or full payment in an

11 amount to be determined by the Probation Department based upon

12 the defendant's ability to pay and/or the availability of

13 third-party payment.

14         The defendant shall not associate in person, through

15 mail, electronic mail, the internet, social media, telephone,

16 or any other means with any individual with an affiliation to

17 any organized crime groups, gangs or any other criminal

18 enterprise; nor shall the defendant frequent any

19 establishment, or other locale where these groups may meet

20 pursuant, but not limited to, a prohibition list provided by

21 the Probation Department.

22         The defendant shall participate in a polygraph

23 examination to obtain information necessary for risk

24 management and correctional treatment.

25         The defendant shall cooperate with the United States

Proceedings                                                    52

1   Probation Department's computer and internet monitoring

2   program.  Cooperation shall include, but not be limited to,

3   identifying computer systems, internet capable devices, and/or

4   similar electronic devices the defendant has access to, and

5   allowing the installation of monitoring software/hardware on

6   said devices, at the defendant's expense.  The defendant may

7   be limited to possessing only one personal internet capable

8   device to facilitate the Probation Department's ability to

9   effectively monitor his internet-related activities.

10          The defendant shall also permit random examinations

11  of said computer systems, internet capable devices, and

12  similar electronic devices, and related computer peripherals,

13  including CD's under his control.

14          The defendant shall report to the Probation

15  Department any and all electronic communications service

16  accounts as defined in 18 U.S.C. 2510(15) used for user

17  communications, dissemination and/or storage of digital media

18  files, i.e., audio, video images.  This includes, but is not

19  limited to, e-mail accounts, social media accounts, and cloud

20  storage accounts.  The defendant shall provide each account

21  identifier and password and shall report the creation of new

22  accounts, changes in identifiers and/or passwords, transfer,

23  suspension and/or deletion of any account within five days of

24  such action.  Failure to provide accurate account information

25  may be grounds for revocation of release.  The defendant shall

Proceedings                                          53

1    permit the Probation Department to access and search any

2    accounts using the defendant's credentials pursuant to this

3    condition only when reasonable suspicion exists that the

4    defendant has violated a condition of his supervised release

5    and that the accounts to be searched contain evidence of this

6    violation.  Failure to submit to such search may be grounds

7    for revocation of release.

8            A search condition:  The defendant shall submit his

9    person, property, house, residence, vehicle, papers,

10   computers, as defined in 18 U.S.C. Section 1030 (e)(1), other

11   electronic communications or data storage devices or media, or

12   office, to a search condition by a United States Probation

13   Officer.  Failure to submit to a search may be grounds for

14   revocation of release.  The defendant shall warn any other

15   occupant that the premises may be subjected to searches

16   pursuant to this condition.  An officer may conduct a search

17   pursuant to this condition only when reasonable suspicion

18   exists that the defendant has violated a condition of his

19   supervision and that the areas to be searched contain evidence

20   of this violation.  Any search must be conducted at a

21   reasonable time and in a reasonable manner.

22           Now, is there anything else that either counsel

23   would like to discuss or any charges that need to be

24   dismissed, beginning with the Government, Probation, and then

25   we will hear from defense counsel?

Proceedings                                        54

1          MS. KOMATIREDDY:  Yes, Your Honor.  Thank you.

2          I apologize.  Your Honor imposed a sentence of 360

3    months, but I missed the allocution of that sentence as to

4    each of Counts Two and Three.

5          THE COURT:  What are you asking, Counsel?

6          MS. KOMATIREDDY:  What is the sentence as to each

7    count, Your Honor?

8          THE COURT:  What do you recommend, counsel?

9          MS. KOMATIREDDY:  Your Honor, I would recommend 15

10   years as to Count Two and 15 years as to Count Three to run

11   consecutively.

12         THE COURT:  So ordered.

13         MS. KOMATIREDDY:  Thank you.

14         And, otherwise, the Government moves to dismiss the

15   remaining count of the superseding indictment, as well we move

16   to dismiss the underlying indictment in this case.

17         THE COURT:  Any objection?

18         MR. RICCO:  No, sir.

19         THE COURT:  The motion is granted.

20         Anything else from the Government?

21         MS. KOMATIREDDY:  I'm sorry, may I just confer with

22   counsel?

23         THE COURT:  You may.

24         MS. KOMATIREDDY:  Lastly, Your Honor, I believe a

25   $200 special assessment applies.

Proceedings                                        55

1          THE COURT:  As I said, $100 per count.  There are

2     two counts.  That comes to $200 under my high math.  That is

3     about as high I can go with the math.

4          Do you agree with that?

5          MS. KOMATIREDDY:  I do.  My rudimentary math

6     concurs, Your Honor.

7          THE COURT:  Okay.  Anything else from the

8     Government?

9          MS. KOMATIREDDY:  No, Your Honor.

10          THE COURT:  Anything else from Probation?

11          THE PROBATION OFFICER:  No, Your Honor.

12          THE COURT:  Let me hear from defense counsel.

13          MR. RICCO:  Your Honor, nothing further.  A very

14     thorough sentencing proceeding.

15          I would ask --

16          THE COURT:  I appreciate that.  I'm going to submit,

17     as I said, after we finish this proceeding and we adjourn to

18     the next proceeding, at the end of the day, I will put that

19     Memorandum and Order on ECF so that you have it in its

20     entirety.  It is obviously read for the benefit of the

21     defendant, the public, the prosecution, defense, and everyone

22     here to know the details of what goes into this sentence.  And

23     you will have that Memorandum and Order to be available to

24     everyone by the end of the day, as I stated.  So that will be

25     clear.  I think it is important and in basic fairness to

Proceedings                                                    56

1  everyone that you see it and see the analysis.

2            MR. RICCO:  I agree, Your Honor.

3            And the other thing I would request, and it is just

4  a request, that the Court recommend in the judgment of the

5  Bureau of Prisons, if it is possible, For the defendant to be

6  able to serve his sentence in the Metropolitan area.

7            It's a very long sentence, Your Honor.  I've seen

8  the impact of long-term incarcerations on defendants who are

9  separated from their family.  Your Honor recognizes that there

10 is a strong relationship here.  And if the Bureau of Prisons

11 can accommodate it for him to be housed near the Metropolitan

12 area, if possible.

13           THE COURT:  Any objection to that request?

14           MS. KOMATIREDDY:  No objection, Your Honor.

15           THE COURT:  I'm going to put that in the order of

16 judgement, and I'm going to make that a very strong request to

17 the BOP.  I think as counsel knows and as the public knows,

18 federal judges do not have power over the BOP, but we are

19 certainly going to make the recommendation.

20           I will note that last evening, in an unrelated

21 matter, the fact that the Federal Defenders and the U.S.

22 Attorney and the BOP, in and unrelated case, having nothing do

23 with this case, were directed by this Court to inspect a

24 particular situation with a particular defendant, and they

25 have actually now issued to my Chief Judge and the Chief

Proceedings                                                    57

1    Magistrate Judge a report dealing with their findings.

2           So, as I said, I have to stay in my lane as a judge,

3    and I do this on a case-by-case basis.  But Federal Defenders,

4    the BOP, and the U.S. Attorney's Office are moving diligently

5    to try to address some of these conditions that everyone is

6    aware of.

7           I have said before and I will say it again and then

8    we will take -- we are going to have a different court

9    reporter come in for the next proceeding, because she has been

10   very kind to stay here and the other court reporter is in the

11   wings to come in for the next proceeding.  We judge our

12   society by how we treat those in our custody.  And I have said

13   this before, and I will say it again, no one is to be treated

14   disrespectfully in our system.  I will not tolerate it as a

15   United States District Court Judge.

16          People ought to be treated respectfully in terms of

17   their person and in terms of their faith.  Everything I can do

18   I do to try to ensure that.  I can't run the BOP.  I can't

19   even make our elevators always work here.  But I can do this.

20   I can say it again and again and again.  I've said it to my

21   judicial colleagues.  I've said it to the Federal Defenders.

22   I've said it to the private bar.  I have said it to the U.S.

23   attorneys.

24          This is real life.  As may pastor says, this is not

25   a dress rehearsal; this is real life.

Proceedings                                                    58

1          I am not going to sit here and pretend that these

2    horrific conditions do not have an impact on everyone in the

3    system:  The defendants, the guards, the marshals, the

4    lawyers, all of us.

5               This is our judicial system.  We have to make it

6    better.  That requires better behavior from the defendants and

7    the marshals and the CSO's, and the prosecutors and defense

8    counsel.  Everyone.  We are in this together.  This is why I

9    took this job.  This is why we invest this power and this

10   responsibility in Probation and Pretrial.  This is what we do.

11              So we're now going to take a very brief break to

12   change court reporters and we are going to proceed to the next

13   proceeding.  I am going to ask counsel if you can avoid

14   leaving -- to avoid leaving while we get this done.

15              MS. KOMATIREDDY:  Your Honor, before we adjourn this

16   proceeding -- I apologize.  I should have raised this earlier

17   --  if the Court could please advise the defendant that he has

18   a right to appeal.

19              THE COURT:  The defendant has a right to appeal.

20              MR. RICCO:  Thank you, Judge.

21              THE COURT:  Anything else?

22              MS. KOMATIREDDY:  No, Your Honor.

23              THE COURT:  Anything else from Probation?

24              THE PROBATION OFFICER:  No, Your Honor.

25              THE COURT:  Anything else from defense counsel?

Proceedings                                                    59

1        MR. RICCO:  No, sir.  Thank you.  We are going to

2   adjourn this proceeding.  We're going to move in the new court

3   reporter.  We are going to proceed right to the next

4   proceeding as I said we would.

5        MR. RICCO:  Can the defendant have a couple of

6   minutes' break?

7        THE COURT:  A comfort break.  Is that acceptable to

8   everyone, including the marshals?

9        U.S. MARSHAL:  Yes, sir.

10        THE COURT:  Why don't you do that.  We will take a

11   10-minute comfort break.  I do mean men minutes.  Everyone

12   behave.

13        (Matter adjourned.)

14

15   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

16

17    /s/ Michele D. Lucchese              December 20, 2021
    _____      _____
18      Michele D. Lucchese                     DATE

19

20

21

22

23

24

25